# United States Court of Appeals
## For the First Circuit

No. 01-2201

CARLOS MORALES FELICIANO ET AL.,

Plaintiffs, Appellees,

v.

JOHN RULLAN, SECRETARY OF THE PUERTO RICO
DEPARTMENT OF HEALTH, ETC.,

Defendant, Appellant.

APPEAL FROM THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF PUERTO RICO

[Hon. Juan M. Pérez-Giménez, U.S. District Judge]

Before

Boudin, Chief Judge,

Bownes, Senior Circuit Judge,

and Selya, Circuit Judge.

Carlos Del Valle, with whom Anabelle Rodriguez, Attorney General, Eileen Landrón Guardiola, and Eduardo A. Vera Ramírez were on brief, for appellant.
Alejandra Bird Lopez, with whom Carlos V. García Gutiérrez, Manuel Rodríguez Banchs, Rafael E. Rodrígues Rivera, and Civil Action and Education Corporation were on brief, for appellees.

July 15, 2002

**SELYA**, **Circuit Judge**.  This interlocutory appeal requires us to revisit a marathon class-action suit brought to remedy unconstitutional conditions of confinement in the Puerto Rico prison system.  On this occasion, the Secretary of the Puerto Rico Department of Health (the Secretary) alleges that the district court's assignment of certain duties to the so-called chief health care coordinator (the CHCC) constitutes an unwarranted modification of a prior injunction and, in the bargain, violates the Prisoner Litigation Reform Act of 1995 (PLRA), Pub. L. No. 104-134, 110 Stat. 1321 (1996) (codified as amended in scattered sections of 18 U.S.C., 28 U.S.C., & 42 U.S.C.).  The plaintiff class (composed of prison inmates) responds that this court lacks jurisdiction to consider the appeal on an interlocutory basis, and that, in all events, the challenged order is a proper exercise of the district court's authority.  We agree with the first of the plaintiffs' assertions:  the challenged order merely clarifies the court's prior decrees and imposes no serious consequences on the Secretary.  Moreover, the order, in the last analysis, is a procedural measure that constitutes an exercise of the district court's housekeeping powers.  For these reasons, immediate appellate review is not available to the Secretary as of right.  Consequently, we dismiss the appeal without addressing the remaining issues briefed and argued by the parties.

## I. BACKGROUND

Although the lore of this case is Byzantine, we confine our introductory remarks to those events that are directly pertinent to this appeal. We refer readers who hunger for more exegetic detail to the district court's myriad opinions. E.g., Morales Feliciano v. Roselló González, 13 F. Supp. 2d 151 (D.P.R. 1998) (Morales II); Morales Feliciano v. Romero Barcelo, 497 F. Supp. 14 (D.P.R. 1979) (Morales I).

In early 1979, representatives of the plaintiff class commenced this action under 42 U.S.C. § 1983. They named several public officials as defendants, including, pertinently, the Secretary. The suit alleged dire shortcomings in virtually every aspect of prisoner confinement. The district court found that the plaintiffs were likely to succeed on some of their claims and issued a preliminary injunction ordering the defendants to address the most pressing of the identified concerns. See Morales I, 497 F. Supp. at 38-41. The court gave very high priority to inadequate medical and mental health care. See id. at 37-38.

Over time, the district court grew frustrated with the defendants' desultory responses to the preliminary injunction. To expedite compliance, the court appointed a monitor in March of 1986. The court charged the monitor with studying the relevant elements of the corrections program and recommending remedial action. With the monitor in place, the court became actively

involved in certain aspects of the management of the prison system. Not surprisingly, the court found inertia to be a persistent problem and, to overcome it, issued temporary restraining orders and contempt citations against the defendants when and as required. The court also began to impose fines for the defendants' most egregious failures to comply with its decrees (particularly those failures relating to overcrowding). Those fines escalated as the foot-dragging continued and the court's level of exasperation mounted. To date, the court has levied aggregate fines totaling nearly $135,000,000.

In October of 1990, the court ordered the implementation of medical and mental health care plans (the Plans) recommended by the monitor. By their terms, the Plans contemplated that overall responsibility for inmate health care would pass from the Administration of Corrections to the Department of Health. The Plans also required the Secretary to employ, for at least three years, a designated official — the CHCC — who would be responsible for easing the transition and coordinating compliance with the Plans.[1] In April of 1993, the Secretary nominated Dr. Aida Guzmán Font to assume the position. The district court approved financial support (from the fine fund) for her endeavors. When her term

---

[1]The designated official initially was called the "chief medical coordinator." The title was changed in December of 1992.

expired three years later, the parties jointly requested that the court approve her reappointment. The court obliged.

In January of 1996, the district court entered what it termed a "partial final judgment." In this decree, the court settled several disputed issues and urged the parties to focus their energies on "consensus-based compliance efforts, and the resolution of yet unresolved areas of the case." In the same document, the court enumerated certain prior orders that it now considered final (including the order approving the Plans and the orders containing the job description for the CHCC position).

The passage of time revealed that the remedial framework was not functioning smoothly. In April of 1997, a court-appointed expert found that the extant correctional health program was a bureaucratic morass incapable of meeting constitutional standards. To rectify this situation, the expert suggested the appointment of a receiver for the ailing program. The parties closed ranks to oppose this recommendation, proposing instead the creation of a private non-profit corporation (the Corporation), which would eventually assume total responsibility for providing medical and mental health services to the inmate population.

On September 26, 1997, the parties filed a stipulation designed to flesh out this joint proposal. Under its terms, the Corporation would provide health care services, consistent with the Plans, to all persons held in institutions operated by the

Administration of Corrections. The stipulation promised "full coordination among all parties concerned" and required the defendants (including the Secretary) to take a series of preparatory steps to lay the groundwork for an effective transition from the existing correctional health program to the new model. The stipulation also memorialized the parties' agreement to engage in further discussions "concerning the role and authority of the CHCC with respect to monitoring the Corporation." Finally, the process of privatization — that is, the transition from the existing remedial framework to the stipulated alternative — was made subject to the district court's supervision. The court would be kept informed by, inter alia, the submission of regular progress reports from the CHCC.

In an ensuing opinion, the district court elaborated on the constitutional deficiencies of the existing health care programs, but declined to rule on the receivership recommendation. Morales II, 13 F. Supp. 2d at 213. Instead, the court issued a series of orders designed to "build on the remedial structure . . . already in place." Id. In so doing, the court reaffirmed its earlier support for the Plans and expressed a willingness to listen should the parties or the CHCC "request modifications of the [Plans] to keep abreast of health care developments or to enhance administrative and fiscal efficiency." Id. at 158.

The court also acknowledged the recommendation for the creation of a private non-profit corporation as a vehicle for the delivery of inmate health care services. See id. at 203 (citing the testimony of an expert in correctional health care to the effect that "[t]he objective of an adequate budget process and a sense of relative permanency can be accomplished through a private not-for-profit health care corporation whose primary mission is correctional health care"). But the court expressed skepticism about the parties' abilities to establish such an entity and ordered class counsel to report within ten days on the progress made in organizing the Corporation. Id. at 214. Within the allotted period, class counsel outlined the steps that were being taken to create the Corporation.

Although Morales II provides, at best, a tentative endorsement of the parties' suggested remedy, the court's subsequent statements and actions indicate full support for the nascent Corporation. That support has been unwavering: despite slower-than-expected progress on the path to privatization, the court has regularly reviewed and approved annual budgets for the Corporation and has authorized the disbursement of substantial monies from the fine fund to cover the Corporation's operating expenses. To date, these disbursements total around $20,000,000.

On March 31, 2000, Dr. Guzmán resigned. The district court believed that recruiting a new CHCC would be inopportune

-7-

given the Corporation's "advanced stage of development" and the court's expectation that the Corporation would take over the delivery of correctional health care services within the next eighteen months. Still, the vacancy left a void. To bridge the gap temporarily, the court entered an order transferring some of the CHCC's duties to the executive director of the correctional health program (Dr. Ernesto Torres Arroyo).

A new administration came to power in Puerto Rico following the November 2000 general elections. The following February, the Secretary — an appointee of the newly-elected governor — sought to terminate Dr. Torres' employment as executive director of the correctional health program. In response to the plaintiffs' objection, the district court restrained the Secretary from cashiering Dr. Torres until such time as the court chose to relieve him of the duties assigned to him after Dr. Guzmán's resignation.

The Secretary did not appeal from this order, but, rather, notified the court that he was reappointing Dr. Guzmán to the vacant CHCC position. In the same motion, he asked the court to approve the appointment. The court ordered the parties to confer and submit a joint proposal designed to harmonize the CHCC's job description with the court's prior orders. The parties were unable to reach agreement. The principal bone of contention centered on the extent to which the Secretary (and, to some degree,

the CHCC) would be in control of decisions regarding the privatization process.

The district court resolved the matter by issuing the order underlying the instant appeal.  That ukase, entered on May 23, 2001, noted that the court had "ordered, as a solution to the myriad of problems affecting delivery of mental and medical health services to the plaintiff class in this case, the creation and organization of a private, not-for-profit corporation, to replace the present Correctional Health Program."  This made it "imperative that the [CHCC] cooperate[] fully with the [Corporation] during the transition period."  To achieve this goal, the court directed the CHCC to (1) provide the Corporation with information reasonably necessary for the performance of its obligations; (2) ensure attendance of correctional health program workers at training seminars organized by the Corporation; (3) appoint coordinators to assist in the development of the training seminars, the reorganization of work areas, and the installation of electronic and telephonic equipment in the medical areas of correctional institutions; (4) guard against the improper use of installed equipment; (5) require the presence of Corporation personnel during consultations with higher officials anent matters related to the provision of correctional health services; (6) inform the Corporation's chief executive officer (CEO) of the times and

locations of certain meetings; and (7) attend relevant meetings called by the Corporation's board or its CEO.

The Secretary chafed at this directive and asked the district court to reconsider it. He argued, inter alia, that the order was superfluous because the CHCC, of her own volition, was cooperating fully with the Corporation. The plaintiff class opposed reconsideration, claiming that there was ample reason to believe that the Secretary and the CHCC were refusing to cede control over the provision of inmate health services while simultaneously conspiring to appropriate the Corporation's resources. When the district court denied reconsideration, the Secretary appealed.

On appeal, the Secretary asseverates that the assignment of new duties to the CHCC contravenes the district court's January 1996 partial judgment, which purported to make final several earlier orders (including the orders that collectively contained the CHCC's job description). Building on that foundation, the Secretary posits that the district court lacked jurisdiction to modify the January 1996 judgment and, alternatively, that the May 23 order fails to comport with the requirements of the PLRA. The plaintiffs counter that this interlocutory appeal must be dismissed for lack of jurisdiction; and that, in all events, the May 23 order is unimpugnable.

## II.  APPELLATE JURISDICTION

It is black-letter law that "[f]ederal courts are courts of limited jurisdiction, and thus must take pains to act only within the margins of that jurisdiction."  Cumberland Farms, Inc. v. Me. Tax Assessor, 116 F.3d 943, 945 (1st Cir. 1997).  Hence, the preferred — and often the obligatory — practice is that a court, when confronted with a colorable challenge to its subject-matter jurisdiction, should resolve that question before weighing the merits of a pending action.  See Berner v. Delahanty, 129 F.3d 20, 23 (1st Cir. 1997); see also Steel Co. v. Citizens for a Better Environment, 523 U.S. 83, 94 (1998).  This principle holds true when an appellate court's right to exercise appellate jurisdiction is called into question.  In re Cusumano, 162 F.3d 708, 712 (1st Cir. 1998); Director, OWCP v. Bath Iron Works Corp., 853 F.2d 11, 12-13 (1st Cir. 1988).  Thus, we turn first to the question of our own jurisdiction.  We start this inquiry by elucidating the general tenets that govern the existence of appellate jurisdiction and then proceed to apply those tenets to the case at hand.

### A.  **The Legal Landscape**.

There is a well-established legislative policy disfavoring inchmeal appellate review.  See Anderson v. City of Boston, 244 F.3d 236, 238 (1st Cir. 2001).  This policy makes very good sense.  "Multiple appeals in a single litigation are necessarily disruptive and, if freely allowed, subject to abuse."

-11-

<u>Sierra Club</u> v. <u>Marsh</u>, 907 F.2d 210, 214 (1st Cir. 1990). Thus, a federal court of appeals, as a general rule, will review decisions made by a district court only after that court enters a final judgment. <u>See</u> 28 U.S.C. § 1291.

This rule, like virtually every general rule, admits of certain exceptions. One exception to the rule against interlocutory appeals is embedded in 28 U.S.C. § 1292(a)(1). That statute authorizes immediate review of district court orders "granting, continuing, modifying, refusing or dissolving injunctions, or refusing to dissolve or modify injunctions." <u>Id.</u> This exception must be strictly construed. <u>Sierra Club</u>, 907 F.2d at 214. Strict construction prevents the statute from being used as a means of evading the final judgment rule.

To determine whether a particular trial court order is appealable under section 1292(a)(1), a reviewing court must look to the practical effect of the order rather than its verbiage. <u>See</u> <u>Carson</u> v. <u>American Brands, Inc.</u>, 450 U.S. 79, 84 (1981). The <u>Carson</u> Court also made plain that a party seeking the benefit of section 1292(a)(1) must establish that the contested order imposes "serious, perhaps irreparable, consequence[s]" and that it may be challenged effectively only by immediate appeal. <u>Id.</u>

Another line of cases has relevance here. Although orders that <u>modify</u> injunctions may be appealable under section 1292(a)(1), orders that merely <u>clarify</u> previously entered

-12-

injunctions are not. See, e.g., Birmingham Fire Fighters Ass'n 117 v. Jefferson County, 280 F.3d 1289, 1292-93 (11th Cir. 2002); United States Fire Ins. Co. v. Asbestospray, Inc., 182 F.3d 201, 207 (7th Cir. 1999); Mikel v. Gourley, 951 F.2d 166, 168 (8th Cir. 1991). To ascertain whether an order modifies an injunction, we must determine whether the underlying decree is of an injunctive character, and if so, whether the ruling complained of can be said to have altered the underlying decree in a jurisdictionally significant way. Sierra Club, 907 F.2d at 212. A change is jurisdictionally significant if it substantially readjusts the legal relations of the parties, see Cunningham v. David Special Commitment Ctr., 158 F.3d 1035, 1037 (9th Cir. 1998), and does not relate simply to the conduct or progress of litigation, see Gulfstream Aerospace Corp. v. Mayacamas Corp., 485 U.S. 271, 279 (1988). Doubts as to the applicability of section 1292(a)(1) are to be resolved against immediate appealability.

### B. **The Case at Hand**.

Here, the Secretary appeals from the district court's order of May 23, 2001, claiming that it modifies a previously issued injunction. He maintains that the underlying injunctive decree — the decree modified by the order appealed from — is the January 1996 partial final judgment. This designation strikes us as arbitrary. The district court created the CHCC position in an order dated October 22, 1990; broadened its purview somewhat by

-13-

order dated December 18, 1992; and continued the office in effect without any appreciable change in the 1996 partial final judgment. By the same token, the court issued several orders affecting the CHCC position in the period between January of 1996 and May of 2001.[2] Last — but far from least — the district court did not refer at all to the 1996 partial final judgment in crafting the order of May 23, 2001. Given this history, the Secretary's designation of the 1996 partial final judgment as the underlying injunction seems odd. The most that can be said is that the combination of orders composing the status quo as of May 23, 2001 amounted to an injunction.

Leaving to one side this obvious weakness in the Secretary's case, the question remains whether the May 23 order represented a jurisdictionally significant change in the status quo. See Sierra Club, 907 F.2d at 212-13. Answering this question requires us to focus on the practical effect of the order. See id. at 213.

As a practical matter, the May 23 order did not break new ground. The stipulation entered into by and between the parties on September 26, 1997 heralded the dawning of a new era, paving the way for a phase-out of the preexisting correctional health program

---

[2]These include an order of May 16, 1997 (directing the CHCC to take contractual steps to maintain continuity of health services) and an order of April 19, 2000 (declining to name a new CHCC because the position would become obsolete within "a brief period of time").

and the creation of the Corporation as a new and different way to provide health services to inmates. That stipulation itself imposed obligations on the CHCC to report on the progress, and otherwise monitor the activities, of the new Corporation. While these changes constituted a dramatic modification of the status quo ante, the Secretary certainly cannot complain about them; they were introduced with the consent and active cooperation of his predecessor in office and, thus, bind the Secretary now. See Cornelius v. Hogan, 663 F.2d 330, 334-35 (1st Cir. 1981) (finding, in an official-capacity suit, that a successor in office was bound by his predecessor's consent decree); see also Fed. R. Civ. P. 25(d)(1). A party's stipulations are binding on that party and may not be contradicted by him at trial or on appeal. Keller v. United States, 58 F.3d 1194, 1199 n.8 (7th Cir. 1995). It follows from these two propositions that a government official, sued in his representative capacity, cannot freely repudiate stipulations entered into by his predecessor in office during an earlier stage of the same litigation.

The Secretary tries to wiggle off this hook by arguing that we should disregard the stipulation because it was not explicitly entered by the district court. This argument borders on the jejune. The parties docketed the stipulation and, although the district court did not instantly embrace it, the court's subsequent actions — particularly the entry of orders designed to facilitate

-15-

the establishment of the new remedial framework and the release of funds to finance those activities — made manifest the court's adoption of the concept. In all events, the court certainly believed that it had approved the stipulation and its serial orders put the Secretary on clear notice of its belief. See, e.g., Order of July 2, 1998 (reminding the parties that "[c]orrectional health services w[ould] soon begin to undergo the transition to a private non-profit corporation"); Order of April 19, 2000 (stating that the court previously had "accepted and ordered the implementation of the parties' stipulations and proposals to create a not-for-profit Correctional Health Services Corporation"). If the Secretary wished to hold the district court to a particular punctilio in the entry of the stipulation, the Secretary had an obligation to assert that position in a timely manner. See Putnam Resources v. Pateman, 958 F.2d 448, 456-57 (1st Cir. 1992) (explaining that an aggrieved party must act expeditiously to cure perceived error); see generally United States v. Taylor, 54 F.3d 967, 972 (1st Cir. 1995) (stating that "a litigant who deems himself aggrieved" by a ruling of the trial judge "ordinarily must object then and there, or forfeit any right to complain at a latter time"). His failure to do so constitutes a waiver.

Against this backdrop, it is surpassingly difficult to see how the May 23 order worked a jurisdictionally significant change in the status quo. In some respects, this case is

-16-

reminiscent of <u>Gautreaux</u> v. <u>Chicago Housing Authority</u>, 178 F.3d 951 (7th Cir. 1999). There, the Seventh Circuit held that an order directing a housing authority to involve a receiver in any settlement negotiations with tenants of a particular housing project was merely a reiteration of an earlier receivership decree that required "full cooperation" with the receiver. <u>Id.</u> at 953. On that basis, the court deemed the order unappealable under section 1292(a)(1). <u>Id.</u> at 958.

This case is similarly configured. The stipulation obligated the parties, in effect, to cooperate fully in the privatization process. The assignment of specific duties to the CHCC — the part of the May 23 order that rankles the Secretary — is simply another way of expressing what is reasonably to be expected from the stipulated promise of full cooperation. In short, the May 23 order is a logical corollary to the Secretary's stipulated commitment to assist in the privatization of the delivery of correctional health services.[3]

The particulars of the May 23 order do not alter this analysis. The specific dictates contained in that order — for instance, those requiring consultation with Corporation personnel

---

[3]This conclusion is fortified by the fact that the CHCC position was created for the express purpose of implementing the Plans. The parties (through the stipulation) and the district court have now determined that privatization is the best route to achieve that goal. From that standpoint, a failure on the part of the CHCC to assist in executing the privatization process would violate her longstanding duty to implement the Plans.

and support of training programs — do no more than identify particular areas in which cooperation is required. Thus, the enumerated duties, taken as a whole, do not modify the status quo in any meaningful way. Confirming this conclusion is the fact that the Secretary initially objected to the May 23 order on the ground that it added nothing new to what the CHCC already was doing. His belated attempt to press the opposite view in this venue is untenable. Cf. Lydon v. Boston Sand & Gravel Co., 175 F.3d 6, 12 (1st Cir. 1999) (warning that "if parties feel free to select contradictory positions before different tribunals to suit their ends, the integrity and efficacy of the courts will suffer") (quoting Patriot Cinemas, Inc. v. Gen. Cinema Corp., 834 F.2d 208, 214 (1st Cir. 1987)).

For much the same reasons, we do not accept the Secretary's plaint that the May 23 order has serious consequences. The order is disruptive, he tells us, because it undermines his authority to control the actions of a subordinate and, concomitantly, forces that subordinate — the CHCC — to preside over the dismantling of the correctional health program. This tale is unconvincing — and mischaracterizes the record to boot.

In the first place, it was the Secretary — not the district court — who insisted on filling the CHCC position. He nominated Dr. Guzmán for the post knowing full well that a court-ordered privatization of health care services was in full swing.

He cannot seriously contend that his unilateral decision to fill this vacancy somehow wipes the slate clean, allowing him to throw a monkey wrench into the privatization process and scuttle the reforms to which his predecessor had stipulated.

In the second place, the consequences that the Secretary cites are the natural sequelae of the earlier agreement to transfer correctional health services to the Corporation. Those woes are not fairly attributable to the May 23 order. By first consenting to the privatization plan and then seeking to fill the CHCC position while the transition to privatization was underway, the Secretary became the author of his own misfortune.

If more were needed on this point — and we doubt that it is — the Secretary's argument misstates the nature of the CHCC position. That position has never been exclusively under the Secretary's hegemony. From the very beginning, the CHCC has been subject to dual oversight, reporting both to the Secretary and the district court.[4] This dual reporting relationship dovetails with the remedial framework that the court erected when it created the CHCC position to address constitutional shortcomings in inmate health services. Given the hybrid nature of the position, fine-tuning the CHCC's role to accommodate the stipulated changeover to

---

[4]The process by which the Secretary aspired to reappoint Dr. Guzmán as the CHCC illustrates this dichotomy. Although the Secretary selected her for the position, he submitted the nomination to the district court for the court's approval.

privatization does little to alter the legal relations of the parties as they existed on May 23, 2001. The alteration, as we have said, dates back to the execution of the stipulation.

There is yet another basis for our conclusion that the May 23 order does not significantly modify the status quo. The parties, through the stipulation, explicitly agreed that "[t]he privatization process must be subject to Court supervision." This language gave the court substantial latitude in procedural matters relating to how best to achieve privatization. Given that fostering compliance with the district court's remedial framework is the CHCC's raison d'être, the order that the Secretary challenges here can be viewed as procedural in nature (akin, say, to the appointment of a monitor).

The Ninth Circuit dealt with an analogous procedural order in Thompson v. Enomoto, 815 F.2d 1323 (9th Cir. 1987), a prisoner class action. There, the court had to decide whether the appointment of a special master to supervise compliance with a consent decree constituted a modification of the decree. Emphasizing the interim nature of the position, the court found no "serious or irreparable harm" stemming from the appointment. Id. at 1327. We think that here, as in Thompson, the order appealed from was within the lower court's reserved power to establish

procedures for compliance with the court's earlier decrees.[5]  Id. So viewed, the May 23 order was simply "a step in controlling the litigation before the court," Baltimore Contractors, Inc. v. Bodinger, 348 U.S. 176, 185 (1955).  Orders of that stripe are not immediately appealable.  See, e.g., Van Orman v. Am. Ins. Co., 680 F.2d 301, 314 (3d Cir. 1982) (dismissing interlocutory appeal when the order appealed from was merely a "judicial housekeeping measure designed to assist the court in framing ultimate relief in the case").

## III.  CONCLUSION

To recapitulate, the May 23 order is not a modification of a previous injunction, but, rather, a clarification of the CHCC's role in light of other developments in the case.  At any rate, the order does not have serious or irreparable consequences for the Secretary because any infringement on his autonomy is a function of previously ordered relief.  Finally, the nature of the obligations imposed on the CHCC places the May 23 order in the category of procedural orders that are not immediately appealable.

---

[5]As was true of the court-appointed special master in Thompson, the CHCC position was never meant to exist in perpetuity. To the contrary, the Plans contemplate that the CHCC will serve a three-year term, and the court has made it abundantly clear that the position will become obsolete once the transition to privatization has been completed.  Thus, the May 23 order is temporary in the sense that it applies only to the transition period.

We need go no further.  For the reasons discussed above, we dismiss the appeal for want of appellate jurisdiction.

**<u>Appeal dismissed</u>**.