# United States Court of Appeals
## For the First Circuit

No. 12-1710

IN RE: IDC CLAMBAKES, INC., d/b/a The Newport Regatta Club,

Debtor

GOAT ISLAND SOUTH CONDOMINIUM ASSOCIATION, INC.,
AMERICA CONDOMINIUM ASSOCIATION, INC.,
CAPELLA SOUTH CONDOMINIUM ASSOCIATION, INC.,

Appellants,

HARBOR HOUSES CONDOMINIUM ASSOCIATION, INC.,

Plaintiff,

v.

IDC CLAMBAKES, INC., d/b/a The Newport Regatta Club,

Appellee.

APPEAL FROM THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF RHODE ISLAND

[Hon. William E. Smith, U.S. District Judge]

Before
Lynch, Chief Judge,
Boudin, Circuit Judge,[*]
and Woodlock, District Judge.[**]

---

[*]Judge Boudin heard oral argument in this matter and participated in the semble, but he did not participate in the issuance of the panel's opinion in this case. The remaining two panelists therefore issued the opinion pursuant to 28 U.S.C. § 46(d).

[**]Of the District of Massachusetts, sitting by designation.

     William R. Grimm and Charles D. Blackman on brief for appellants.

     William P. Devereaux, with whom Thomas R. Gonnella, Matthew C. Reeber, Benjamin L. Rackliffe were on brief for appellee.

---

August 14, 2013

---

**WOODLOCK, District Judge**. This case arises out of nearly twenty years of litigation conducted along multiple fronts between real estate development entities on the one hand and the condominium entities generated by this development on the other. Since at least 1994, the Plaintiff/Appellant Condominium Associations and the IDC development entities -- IDC, Inc.; IDC Properties, Inc.; and IDC Clambakes, Inc., the Defendant/Appellee in this matter -- have been disputing the ownership and use of certain property on Goat Island in the City of Newport, Rhode Island.

The focus of the matter now before us is framed by the fact that IDC Properties constructed and Defendant IDC Clambakes operated The Newport Regatta Club on the contested property after the Associations had asserted that the rights of IDC entities to own or develop the property had lapsed. Eventually the Rhode Island Supreme Court found in favor of the Associations. The Associations thereafter sought to evict IDC Properties from the land, and IDC Clambakes declared bankruptcy. This case comes to us on appeal from a bankruptcy court decision and concerns the question whether IDC Clambakes trespassed on the Associations' property or whether, through their actions during the pendency of the litigation, the Associations impliedly consented to operation of the Regatta Club by IDC Clambakes while title to the land remained unclear.

Despite ongoing formal disputes in the state and federal courts, the parties apparently enjoyed a generally congenial relationship regarding the Regatta Club. The Associations did not challenge building, liquor, or operating permits for IDC Properties during construction other than to question the sufficiency of planned parking space and zoning compliance. Instead, various members of the Associations regularly contracted with the Regatta Club for event space for annual meetings and private events.

The record is marbled with contradictory evidence regarding manifestations of consent for Clambakes to operate on the property. Ultimately, however, we find that the bankruptcy court's decision as to implied consent is a plausible interpretation of a problematic record. That decision is fully reasoned and supported by the evidence. Accordingly, we affirm as to that issue but nevertheless find it necessary to remand as to the issue of whether compensation is owed for Clambakes' authorized use and occupancy.

I.

The material facts and history are essentially undisputed. For the sake of clarity, we summarize only those facts pertinent to this appeal. A more complete factual and procedural history underlying the protracted litigation may be found in decisions of the District Court, the Bankruptcy Court, and the Rhode Island Supreme Court. See, e.g., In re IDC Clambakes, Inc., C.A. No. 10-267 S, 2012 WL 1194122, at *1-3 (D.R.I. Apr. 10, 2012); In re IDC Clambakes, Inc., 431 B.R. 51, 54-57 (Bankr. D.R.I. 2010);

-4-

<u>Am. Condo. Ass'n., Inc.</u> v. <u>IDC, Inc.</u>, 844 A.2d 117, 119-26 (R.I. 2004) ("<u>America I</u>").

In 1997 and 1998, IDC Properties constructed the Newport Regatta Club on a piece of property -- known throughout this litigation as the Reserved Area -- in spite of an ongoing dispute over ownership and development rights to the land. IDC Properties began this development "with full knowledge of plaintiffs' claims and after they voluntarily entered into [a] tolling agreement." <u>In re IDC Clambakes, Inc.</u>, 360 B.R. 24, 26 (Bankr. D.R.I. 2007). The Associations, IDC Properties, and Thomas Roos (the sole shareholder of each of the IDC entities) entered into this tolling agreement on January 5, 2008, having engaged in years of discussions and negotiations regarding the validity of amendments to the Condominium Master Declaration purporting to grant IDC Properties the right to develop the land when it did. After several extensions, the Tolling Agreement was set to expire on May 31, 1999.

During the process of construction and permitting for the Regatta Club, the Associations formally objected only to the parking requirements. When IDC Properties filed for a building construction permit, the America Condominium Association raised a concern by writing to the Zoning Officer that, "It's our understanding that a permit application has been filed with your Office for the purpose of constructing a bldg. . . . While we don't have a particular objection as to the land use with respect to the

-5-

building itself, we do have a substantial problem with the parking requirements for that bldg. . . . ." The Associations were aware that Clambakes applied for a liquor license transfer and sought to delay the transfer, but only so the Zoning Board of Appeals could resolve the parking issue dispute. Ultimately, the City Council approved the liquor license transfer from Dorell, Inc. to IDC Clambakes, Inc., the entity created in 1996 to lease and operate the Regatta Club, and the debtor appellee in this action. Nevertheless, Mr. Roos has stipulated that IDC Properties built the Regatta Club at a time when he understood that the Associations were "trying to say that Properties had no right to construct the Regatta Club."

IDC Clambakes was not a party to the Tolling Agreement, and because the lease between IDC Properties and IDC Clambakes was never recorded and Clambakes did business under the name "Newport Regatta Club," the record remains vague regarding the extent to which the Associations understood or were aware of the precise role Clambakes had in the development and operation of the Regatta Club.

On May 29, 1999, about six months after the use and occupancy certificate was approved, Clambakes began operating the Regatta Club and three days before the Tolling Agreement expired, the Associations filed a seven-count state court action against Mr. Roos, IDC Properties, and IDC, Inc., seeking damages and a declaration that the voting scheme that purported to extend development rights to IDC at the time it built the Regatta Club was

invalid. This action "did not involve any claims of trespass, or appear to involve any issues related to trespass or damages flowing therefrom." Goat Island S. Condo. Ass'n., Inc. v. IDC Clambakes, Inc., 382 B.R. 178, 180 (D.R.I. 2008); see also America I, 844 A.2d at 125, 125 n.13. Over the next six years, the parties litigated ownership of the Reserved Area in the Rhode Island state courts until April 8, 2005 when the Rhode Island Supreme Court declared that "title [to the Reserved Area] rested with the unit owners in common ownership" and not with IDC. Am. Condo. Ass'n., Inc. v. IDC, Inc., 870 A.2d 434, 443 (R.I. 2005) ("America II").

Meanwhile, during this protracted and contentious litigation over ownership of the property, the Harbor Houses Condominium Association, a plaintiff below but not an appellant in this appeal, contracted with Clambakes to use the Regatta Club for its annual meetings and various condominium unit owners regularly contracted with Clambakes to host private events at the Regatta Club. None of the Associations made any effort to enjoin Clambakes or to evict it from the property. It was not until after the Rhode Island Supreme Court's decision in America II that the Associations filed for Writs of Execution and Ejectment.

Following the Rhode Island Supreme Court's decision in America II, Clambakes tried a variety of initiatives to avoid the seemingly inevitable consequences of the Court's ruling. One week after the decision in America II, Clambakes filed a civil action in Rhode Island Superior Court, arguing among other things that it

-7-

owned the contested property by adverse possession.  Two months later, on June 16, 2005, Clambakes filed the current Chapter 11 case to trigger the automatic stay, see 11 U.S.C. § 362, and stave off enforcement of the state court judgment while relitigating some of the issues that the state courts had already addressed. These strategies proved unsuccessful.  Eventually, a bankruptcy plan was confirmed for Clambakes.

The district court vacated the bankruptcy court's initial decision, see Goat Island S. Condo. Ass'n., Inc., 382 B.R. at 179-80, and remanded the case for a more thorough development of the facts and compliance with due process.[1]  On remand, the bankruptcy court held a nine-day trial and, relevant to this appeal, held that Clambakes was not liable for trespass between March 1, 1998 and April 8, 2005 because the Associations impliedly consented to Clambake's operation of the Regatta Club.  The bankruptcy court denied any award of damages for this period.

---

[1] The bankruptcy court's initial decision held that IDC Clambakes had been a trespasser but that the Associations were not entitled to damages for the trespass because the state court's award of damages (unrelated to trespass) in the America litigation had preclusive effect on the bankruptcy court claims and, additionally, that damages would result in unjust enrichment based on the "totality of circumstances."  In re Clambakes, Inc., 360 B.R. 24 (Bankr. D.R.I. 2007).  The district court held that the bankruptcy court misapplied Rhode Island trespass law, that "totality of the circumstances" is not a proper ground to deny an award of damages, and that preclusion was inappropriate both because the America litigation did not address trespass and because the parties had not filed any motion for summary judgment regarding trespass as the bankruptcy court claimed.  Goat Island S. Condo. Ass'n., Inc. 382 B.R. 178.

Both parties appealed to the district court. The district court affirmed, see In re IDC Clambakes, Inc., 2012 WL 1194122, and this appeal followed.

II.

We review the bankruptcy court's decision without deference to the district court's ruling. "The court of appeals undertakes an independent review of [a] bankruptcy court order, utilizing the same appellate standards governing the district court review." In re LaRoche, 969 F.2d 1299, 1301 (1st Cir. 1992). Thus, we review the bankruptcy court's factual findings for clear error and its conclusions of law de novo. Jeffrey v. Desmond, 70 F.3d 183, 185 (1st Cir. 1995); In re G.S.F. Corp., 938 F.2d 1467, 1474 (1st Cir. 1991).

"[A factual] finding is 'clearly erroneous' when although there is evidence to support it, the reviewing court on the entire evidence is left with the definite and firm conviction that a mistake has been committed." In re the Bible Speaks, 869 F.2d 628, 630 (1st Cir. 1989). If the bankruptcy court's "account of the evidence is plausible in light of the record viewed in its entirety, [we] may not reverse." Id. at 630. However, we may affirm the decision of the bankruptcy court "on any ground supported by the record." In re Carp, 340 F.3d 15, 21 (1st Cir. 2003).

Mixed questions of law and fact "invok[e] a sliding standard of review . . . ." Braunstein v. McCabe, 571 F.3d 108,

124 (1st Cir. 2009). The more fact intensive the question, the more deferential the level of review (though never more deferential than the "clear error" standard); the more law intensive the question, the less deferential the level of review. See <u>Sierra Fria Corp.</u> v. <u>Donald J. Evans, P.C.</u>, 127 F.3d 175, 181 (1st Cir. 1997).

### III.

Rhode Island law, which governs this trespass action, defines a trespasser as "[o]ne who intentionally and without consent or privilege enters another's property." <u>Bennett</u> v. <u>Napolitano</u>, 746 A.3d 138, 141 (R.I. 2000). There is no question that the Associations have made out two of the basic elements for a trespass claim: Clambakes intentionally and voluntarily entered the land and the land was in the Associations' rightful possession. Clambakes does not dispute this. The relevant question on appeal is whether the bankruptcy court appropriately found implied consent.

### - A -

We address two preliminary issues before turning to the substance of the bankruptcy court's decision. In doing so, we confront two arguments mounted by the Associations which, while technically accurate as statements of legal principle, have no bearing on this case.

## 1. Mistake as to Ownership

The Associations' first argument -- that a mistake as to ownership is not a defense to trespass -- misses the point. Mistake as to ownership played no role in the bankruptcy court's determination, and therefore was not the source of any error. Further, any mistaken belief by Clambakes that IDC Properties owned the land does not have the preclusive effect Appellants suggest. The fact that Clambakes entered into a lease with IDC Properties, which was under the mistaken belief that it owned the disputed property, does not preclude a finding that Clambakes may have thought it had the Associations' implied consent to operate. The two forms of permission are not mutually exclusive, particularly in a situation where all parties involved understood that title was in dispute. Neither of the Associations' cited cases, Campbell v. Lederer Realty Corp., 129 A. 732, 733 (R.I. 1925); Rhode Island Economic Development Corp. v. The Parking Co., L.P., 909 A.2d 943, 945 (R.I. 2006), can support the proposition that an entity entering into a lease for contested property with the apparent landowner is thereby prohibited from also seeking or receiving permission from another party claiming ownership.

## 2. Reasonable Reliance

The Associations' next argument -- that there can be no apparent consent without a finding of reasonable reliance -- finds no application in this appeal. Appellants appear to contend that the bankruptcy court made no finding of reasonable reliance,

-11-

despite the court's specific statement that "[the Associations'] conduct demonstrates a continuing unequivocal expression of consent . . . , *upon which Clambakes reasonably relied*." In re IDC Clambakes, Inc., 431 B.R. at 60 (emphasis added). The propriety of this finding presents a separate issue, discussed in more detail below, but the argument that this case warrants reversal for failure to find reasonable reliance cannot withstand even the most cursory glance.

With those preliminary issues resolved, we move on to the substantive issues underlying the central question of implied consent.

- B -

Consent, in any form, is fatal to a claim for trespass.[2] Consent can be spoken or unspoken, express or implied, and there is no requirement that it be communicated to the actor. Restatement (Second) of Torts § 892 (1970). Apparent consent arises from the parties' conduct and from context. Griggs-Ryan v. Smith, 904 F.2d 112, 117 (1st Cir. 1990). It is sufficient that a party reasonably understands words or conduct as conveying consent. Restatement

---

[2] Beginning with the bankruptcy court's opinion on remand, the opinions and briefs in this case -- from post-trial motion through this appeal -- use the terms "implied consent" and "apparent consent" interchangeably. Although the terms are not necessarily synonyms, any distinctions are not relevant to this case and we therefore treat them as interchangeable in their phraseology and application here.

(Second) of Torts § 892.[3]   This is true "[e]ven when the person concerned does not in fact agree to the conduct of the other" as long as his "words or acts or even his inaction . . . justify the other in acting in reliance upon them."   Id. at § 892 cmt. c. However, there is no consent "if a reasonable person would not understand from the words or conduct that consent is given . . . even though he honestly so believes . . . ."   Id.

We first address whether the bankruptcy court appropriately found that actions by the Associations reasonably conveyed apparent consent.  We then turn to the question whether the bankruptcy court properly found that Clambakes did, in fact, reasonably rely on those actions.

1. Manifestation of Apparent Consent

The bankruptcy court's determination that the Associations' actions manifested consent for Clambakes' operation of the Regatta Club falls within that court's authority as fact finder.  To be sure, the evidence is not one sided.  There is evidence in the record sufficient to support either a finding of consent or a finding of no consent as well as evidence irreconcilably inconsistent with either alternative outcome.  Yet determinations of the character and weight of the evidence are best left to the finder of fact.  United States v. Young, 105 F.3d 1, 5

---

[3] The Rhode Island Supreme Court looks to the Restatement of Torts in deciding trespass claims.  E.g., Mesolella v. City of Providence, 508 A.2d 661, 667 n. 8 (R.I. 1986).

-13-

(1st Cir. 1997) ("[T]he trial judge, who hears the testimony, observes the witnesses' demeanor and evaluates the facts first hand, sits in the best position to determine what actually happened."). And "[w]here there are two permissible views of the evidence, a factfinder's choice between them cannot be clearly erroneous." In re The Bible Speaks, 869 F.2d at 630.

The Associations rely on the parties' long history of bitterly contentious disputes over ownership of the property, arguing that their own actions foreclose the possibility of any manifestation of consent when understood in the context of the specter of the parties' various legal struggles. The Associations entered into the Tolling Agreement with IDC, Inc., IDC Properties, and Mr. Roos before IDC Properties began building the Regatta Club, in order to preserve their claims that the voting scheme purporting to extend development rights for IDC was invalid. Thus, from the very outset -- and before the Regatta Club was built, let alone operating at full scale under Clambakes' management -- the Associations manifested some opposition to development on the disputed property. The Associations also opposed certain permits and licenses required for the construction of the Regatta Club, though never on grounds of trespass. They opposed the building permit, stating, "[w]hile we don't have a particular objection as to the land use with respect to the building itself, we do have a substantial problem with the parking requirements for that bldg., as well as for other commercial parking on and around that site."

-14-

The Associations also delayed the liquor license transfer based on the parking concerns but did not raise any other objection and the City Council ultimately approved the transfer.

Having failed to prevent the *construction* of the Regatta Club, the Associations notably declined to take action against the Club's *operation* until after resolution of the state court litigation. As the bankruptcy court noted, Clambakes continued to operate the Regatta Club "for more than seven years, with no written or verbal notice, signage, or any other type of claim made against Clambakes to quit the premises." In re IDC Clambakes, Inc., 431 B.R. at 60. The only evidence in the record of a post-construction effort opposing Clambakes' operations is a letter from Daniel Kinder, an individual unit owner, to the Newport City Council opposing Clambakes' application to expand its outdoor entertainment license. Mr. Kinder states that "IDC applies for a license to which it had no right. IDC does not own the property in question." However, this letter is dated May 7, 2003, *after* the Rhode Island Superior Court's decision in favor of the Associations, albeit before the Rhode Island Supreme Court's final decision. The Associations also lean heavily on a letter from the American Condominium Association to the Mayor of the City of Newport, dated June 17, 2000 -- more than a year after Clambakes began operating the Regatta Club -- which seeks to enforce an unheeded November 1999 Cease and Desist letter against IDC Properties ordering it to halt construction of a gazebo or pavilion

-15-

at the Regatta Club.  This letter cannot support the weight the Associations seek to place on it.  Read in context, the letter does not seek to eject Clambakes' operation, but rather to "ensure that IDC does not, in any way, use or occupy [the structure] *prior to the resolution of the Zoning issues*" (emphasis added).  This, then, is not an effort to halt the Regatta Club's operation permanently, but apparently only to enforce the zoning ordinances governing parking and liquor.[4]  Moreover, there does not appear to be any evidence in the record that Clambakes or Mr. Roos ever saw this letter, and it therefore does not bear on the Associations' manifestation of consent one way or the other.

The completion of the Regatta Club did not, of course, mark the end of hostilities between the parties.  In May 1999, just before the expiration of the Tolling Agreement, the Associations filed a state court action that dragged out for more than six years regarding ownership of the land.  In October 1999, they recorded a Notice of Lis Pendens.  However, these disputes over ownership of the land are not necessarily equivalent to disputes over operations taking place on the land during the pendency of the ownership issue litigation.  As the Associations point out, Mr. Roos has testified that "[the Associations] were challenging every single right that they could possibly think of."  But, in that statement, he was

_____

[4] The American Condominium letter does not expressly state which zoning ordinances the C&D referenced, and the record does not appear to include a copy of the C&D.

-16-

commenting on the time frame in 1997 when IDC Properties was beginning construction, not the post-construction time frame which revealed the Associations' apparent disinclination to challenge the actual operation of the Regatta Club. In fact, in the swirling fog of the litigious war between the parties, this small but discernible area of calm and clarity is especially striking. As the bankruptcy court supportably found, "it is clear that the Associations and the Roos entities have fought over and litigated every conceivable issue *except* Clambakes' occupancy and operation of the Regatta Club . . . ." In re IDC Clambakes, Inc., 431 B.R. at 60-61 (emphasis in original).

For these reasons, the Associations' actions and inactions do not necessarily foreclose the possibility that it reasonably manifested apparent consent for Clambakes' operations. And in support of its holding, the bankruptcy court relied on a number of other factors affirmatively indicating consent.

*First*, the bankruptcy court put particular emphasis on the fact that the Associations specifically omitted Clambakes from the Tolling Agreement, all subsequent extensions, and the America litigation. Id. at 60 ("From the outset, Clambakes was never included as a party to the . . . Tolling Agreement . . . . During the construction and even after it commenced operations, Clambakes still was not added as a party to the Tolling Agreement . . . . Clambakes was not a party in [the America] litigation."). On appeal, the Associations contend that the bankruptcy court

-17-

committed clear error because "[t]here is no evidence in the record that supports the conclusion that the Associations knew that 'Clambakes' (as opposed to IDC Properties or IDC, Inc.) was operating the Regatta Club . . . ."

The evidence in the record on this issue is a jumble of contradictions: *On the one hand*, IDC Properties held itself out as the operator of the Regatta Club in its answers to interrogatories; letters from the Regatta Club to the Associations frequently came from IDC, Inc.; the lease between IDC Properties and Clambakes was not recorded; all of the event contracts for the Regatta Club were in the name of IDC, Inc.; and Clambakes has described itself as a "bookkeeping entity." *On the other hand*, a newspaper reported Clambakes as the owner of the Regatta Club when the liquor license was granted; letters from Raymond Morrissette, President of the American Condominium Association, and Mr. Kinder both acknowledge Clambakes' applications for various licenses to operate the Regatta Club; and the Associations asked for a list of Clambakes' shareholders during the state court litigation. Resolution of this evidence based on its character, weight, and credibility involves determinations of fact by the trial court to which we defer, absent clear error. See In re The Bible Speaks, 869 F.2d at 630; Young, 105 F.3d at 5. The bankruptcy court's determination finds reasonable support in the record, and we therefore find no clear error in the bankruptcy court's reliance on this determination.

*Second*, during construction of the Regatta Club, the Associations specifically stated "we don't have a particular objection as to the land use with respect to the building itself, we do have a substantial problem with the parking requirements for that bldg. . . . ." See In re IDC Clambakes, Inc., 431 B.R. at 60. The Associations suggest this letter is taken out of context and merely asserts no disagreement as to the impact of the building's zoning on the number of required parking spaces. A review of the fuller context of the letter belies the Associations' argument and indicates that the letter means precisely what it says.

*Third*, the Harbor Houses Condominium Association contracted with Clambakes to use the Regatta Club for its annual meetings and various condominium unit owners regularly contracted with Clambakes to host private events. See id. It is true that the individual unit owners do not have the power to bind the Associations, cf. R.I. Gen. Laws § 34-36.1-3.02(a)(9) (granting the unit owners association the right to enter into leases, licenses and concessions over the common elements), and that the Associations currently maintain that they did not, in fact, consent to Clambakes' operation of the Regatta Club. However, the actions of individual owners and one of the Associations themselves, freely contracting at market rates for meeting and event space without objection, are the kinds of actions that manifest consent and justify reasonable reliance "[e]ven when the [Associations] do[] not in fact agree to the conduct of the other." Restatement

(Second) of Torts at § 892 cmt. c. The Associations should have understood that their repeated, public patronage of the Regatta Club (and that of their members) reasonably contributed to a manifestation of apparent consent.

*Fourth*, the bankruptcy court considered that, until the America II decision in 2005, the negotiations and litigation concerned ownership of the land only, not the operation of the business, and never included a claim for trespass, ejectment, or eviction. The bankruptcy court stated that "this apparently consensual relationship between Clambakes and the Associations continued for more than seven years, with no written or verbal notice, signage, or any other type of claim made against Clambakes to quit the premises." In re IDC Clambakes, Inc., 431 B.R. at 60.

The Associations argue that this fourth factor (a) is inconsistent with the statute of limitations and (b) would impermissibly require them to move for a preliminary injunction rather than allow them to rest on their claims for legal and equitable remedies at final judgment. Both arguments misunderstand the bankruptcy court's ruling.

A party may bring a claim for trespass until the last day passes for determining when the statute of limitations runs. But if the party consents to the use of the property, no trespass exists to which the statute of limitations would apply. The bankruptcy court did not hold that the Associations waited too long

-20-

to bring their valid claim.  It held that they had no claim in the first instance due to their apparent consent.  Id. at 61.

Furthermore, the bankruptcy court did not suggest that the Associations must move for a preliminary injunction preventing Clambakes' encroachment on the property or else risk manifesting consent.  A party can choose the relief it seeks, but it must actually seek the relief it wants.  The bankruptcy court grounded its finding that the Associations manifested consent on the fact that they specifically did not seek to hold any IDC entity liable for trespass or to eject or evict them, but rather focused their claims exclusively on land ownership.  The Associations now say they wanted all of the IDC entities to cease operations on the disputed property, but they did not meaningfully pursue such relief until after the decision in America II.  To be sure, the Associations did identify this kind of relief in the prayers of their state court complaint, where they demanded judgment "for a preliminary and permanent injunction requiring restoration of the [property] to their condition as of December 31, 1994 [before construction of the Regatta Club]" as well as "for a mandatory injunction requiring Declarant to restore the easement to its condition prior to Declarant's wrongful conversion."  However, the Associations also submitted in their complaint that they would accept "an award of compensatory damages in an amount to be determined at trial."  The Associations' subsequent actions in litigating the complaint indicate a disinclination to stop

-21-

Clambakes from operating in favor of compensation for use of the land.

Assuredly, the Associations actions over the course of this period have been far from consistent, but the record contains substantial, credible evidence from which the bankruptcy court reasonably found that the Associations manifested apparent consent.

## 2. Reasonable Reliance

The bankruptcy court's finding that Clambakes actually and reasonably relied on the Associations' manifestations of apparent consent, In re IDC Clambakes, Inc., 431 B.R. at 60, also falls within the Court's authority as fact finder. We come to that conclusion recognizing that the Associations point to considerable evidence that they claim is inconsistent with a finding of reasonable reliance.

The Associations' claim is that Clambakes did not actually believe that the Associations had provided consent and therefore could not have reasonably relied on any manifestations of consent. Chief among the parade of factors that the Associations emphasize is Mr. Roos' stipulation that "[IDC] Properties constructed the Regatta Club at a time when Roos understood the Condominium Associations representatives were trying to say that Properties had no right to construct the Regatta Club." This is important evidence of Mr. Roos' understanding of consent -- or lack thereof -- at a critical time in this case, but it is not, alone,

dispositive on the issue of reasonable reliance as the Associations argue.

This court treats Mr. Roos' statement -- as a stipulated fact -- to be true, <u>Morales Feliciano</u> v. <u>Rullan</u>, 303 F.3d 1, 8 (1st Cir. 2002) ("A party's stipulations are binding on that party and may not be contradicted by him at trial or on appeal."), but that does not guarantee that the fact is by itself dispositive. The stipulation must be weighed against other evidence in the record in order to determine whether the bankruptcy court committed clear error. For instance, the stipulated understanding of Mr. Roos must be weighed against the fact that the Associations only objected to the parking aspects of Clambakes' application for a building permit and the Zoning Board eventually approved Clambakes' liquor license transfer. Moreover, Mr. Roos stipulated only that he knew the Associations were opposed to *construction* of the Regatta Club, which, as discussed above, is consistent with the Associations pursuing claims of land ownership only, and does not necessarily contradict consent for *operation* of the Regatta Club once constructed. Finally, the stipulation speaks only to Mr. Roos' understanding at the time of construction. As discussed above, many of the Associations' manifestations of consent (such as contracting with the Regatta Club, only pursuing land ownership claims, and not joining Clambakes in the tolling agreement or <u>America</u> litigation) arose after the time of construction. Thus, even if Mr. Roos had understood at the time of construction that

-23-

the Associations would not have consented to Clambakes' operation of the Regatta Club, subsequent events could reasonably be found to have changed his understanding. A trial court might permissibly find that Mr. Roos' stipulation weighs against a finding of reasonable reliance, though it does not necessarily carry as heavy a weight as the Associations contend.

Similarly, the Associations argue that Clambakes admitted that it did not have their consent to operate the Regatta Club when it filed a state court complaint on December 28, 2006 alleging adverse possession, which necessarily includes the allegation that possession was hostile and without consent. See Reitsma v. Pascoag Reservoir & Dam, LLC, 7724 A.2d 826, 834-35 (R.I. 2001). This proves too much. Clambakes argued in the alternative that the Associations "consented to, agreed, permitted, and allowed Clambakes' use and occupancy of the Reserved Area." As mere allegations in the alternative, neither position is a binding representation and neither demands greater consideration than the other. Nor did the state court resolve either of these arguments such that Clambakes would be bound by judicial estoppel. We therefore decline to consider the allegations in Clambakes' state court complaint as undercutting to the bankruptcy court's determination.

The Associations also contend that Clambakes could not have reasonably relied on any manifestations of consent because it relied, not on consent, but on Mr. Roos' level of confidence that

-24-

the IDC entities had a right to the property. This is a troublesome aspect of the reasonable reliance analysis. The bankruptcy court's finding of reasonable reliance -- indeed, any finding of reasonable reliance in this case -- necessarily rests on the notion that Clambakes relied on a belief that it had permission from both parties claiming to own the land. As discussed above, Clambakes entered into its lease with IDC Properties under the mistaken belief that IDC Properties owned the land. This does not necessarily preclude the possibility that Clambakes may have believed it also had the Associations' consent, but the greater the degree of confidence in IDC Properties' ownership of the land, the weaker the permissible inference that Clambakes actually relied on the Associations' manifestations of apparent consent in choosing to continue to operate the Regatta Club.

Some of the evidence regarding Mr. Roos' confidence may amount to posturing or litigation strategy, such as the early threats to sue the Associations for slander of title, and the various legal positions taken throughout the America litigation. Other evidence, however, appears to show that Mr. Roos had little question in his mind as to the validity of the amendments to the Condominium agreement conferring ownership on IDC Properties. When asked "you believed that IDC Properties, Inc. owned [the Reserved Area]," Mr. Roos responded: "I knew we owned it," and when asked if he believed the sixth amendment to the condominium agreement gave him title, he responded: "The 6th amended did give me title." The

fact that the IDC entities built and operated a multi-million dollar banquet hall and business on land they knew the Associations also claimed to own equally underscores their confidence in their own title to the land.

Ultimately, these facts may reflect a dispute whether Clambakes truly relied upon any apparent consent from the Associations, whether it simply believed IDC Properties' claim to the land was beyond reproach, or whether it simply pressed on, building and operating the Regatta Club on the gamble that events would resolve in its favor. However, the fact of a dispute is not sufficient to justify reversal.

Reasonable reliance presents a mixed question of law and fact, and it is clear from the bankruptcy court's decision that the reasonable reliance analysis was deeply fact intensive. The bankruptcy court focused, in particular, on evidence that Clambakes maintained years-long contractual relationships with the Associations and individual owners, presumably expecting continued business regardless of the outcome of the America litigation. The bankruptcy court also focused on the evidence of the striking absence of trespass claims or claims against Clambakes in the otherwise comprehensive litigation.

While this may be a disputable question, and the record contains evidence in support of and irreconcilably contradicting both sides, resolution ultimately depends on determinations as to the character and weight of the evidence. It is clear that the

-26-

bankruptcy court's ruling rested, not on any particular piece of evidence, but on its assessment of the whole factual record. Thus, on the sliding scale, the standard of review approaches "clear error," see Braunstein, 571 F.3d at 124. Here, an alternative reading of the record does not amount to "a strong, unyielding belief that a mistake has been made." In re Carp, 340 F.3d at 22. We therefore uphold the bankruptcy court's finding of reasonable reliance.

IV.

Having found that the Associations impliedly consented to Clambakes' operation of the Regatta Club from the time of its construction through the end of the America litigation, we turn to the Associations' argument that implied consent necessarily gives rise to an implied obligation to pay. The Associations essentially argue that, even if they did consent to Clambakes occupying and operating on the Reserved Area, their conduct could not reasonably have been understood to confer permission to do so free of charge.

The record reveals colorable support for the Associations' position. Clambakes entered into a lease for the land, paying IDC Properties. Thus, Clambakes understood that it owed money to the property owner (which it mistakenly believed to be IDC Properties) for use of the land. And although the America complaint brought no claim for trespass, it did seek either to force the IDC entities to return the land to its condition before development or to pay compensatory damages. The Associations'

-27-

actions manifested apparent consent for Clambakes to use the property, but not necessarily to do so rent free. The America litigation made abundantly clear that even if the Associations consented to the operation of the Regatta Club, they would pursue their rights to ownership of the land and their right to compensation for the land's use.

In their brief on appeal, the Associations cite three cases, which they claim stand for the proposition that implied consent under these conditions gives rise to an implied obligation to pay: Narragansett Elec. Co. v. Carbone, 898 A.2d 87 (R.I. 2006); R&B Elec. Co., Inc. v. Amco Constr. Co, Inc., 471 A.2d 1351 (R.I. 1984); Bailey v. West, 249 A.2d 414 (R.I. 1969). All are implied contract cases. Clambakes contends that the Associations waived this argument by failing to raise it at the trial (bankruptcy) court level. The District Court, on appeal, agreed. See IDC Clambakes, Inc., 2012 WL 1194122, at *8 n.4 ("The Associations argue . . . implied consent necessarily gives rise to an implied obligation to pay fair value of the benefit received. . . . [T]his argument was not raised before the bankruptcy court below and is, accordingly, not properly before this Court on appeal."). This reflects a clearly erroneous view of the record. Although the bankruptcy court never addressed the issue, the Associations did raise the argument. In a post-trial motion filed December 4, 2008, just over a week after the trial and 18 months before the bankruptcy court issued its decision, the Associations argued that

-28-

"[e]very theory of implied consent gives rise to a corresponding implied obligation to pay for the value of what was received. Debtor should not . . . be permitted to retain the benefit . . . but pay . . . nothing." In fact, before the bankruptcy court, the Associations grounded this argument on precisely the same three cases which were cited in its briefing before this court.

Despite the fact that the Associations presented their implied-obligation-to-pay argument in their post-trial motion, the bankruptcy court did not decide, or even mention, the issue. See IDC Clambakes, Inc., 431 B.R. 51. The issue is insufficiently developed for proper adjudication on appeal, see Greenpack of P.R., Inc. v. Am. President Lines, 684 F.3d 20, 30 (1st Cir. 2012); Bakia v. Cnty. of Los Angeles, 687 F.2d 299, 301 (9th Cir. 1982) (remanding where appeals court did not have benefit of trial judge's evaluation of the arguments), and is more appropriately directed to the trial court in the first instance for determination whether the facts in this case and the law of Rhode Island support a finding of consent to operate free of charge or whether the Associations conditioned their implied consent on an implied obligation to pay. We therefore remand as to the question whether implied consent in this case also gives rise to an implied obligation to pay the fair value for use and occupancy of the property.[5]

---

[5] We note that as part of its bankruptcy responsibilities, IDC Clambakes has placed "sufficient funds . . . in escrow to pay the Associations in full, if their claims are allowed. That fund

We <u>affirm</u> as to implied consent for the use and occupancy of the property but <u>remand</u> for further proceedings consistent with this opinion regarding the issue whether the implied consent in this circumstance gives rise to an obligation to pay the fair value for such use and occupancy and, if so, in what amount.  Each party shall bear their own costs.

---

remains intact."  <u>In re IDC Clambakes, Inc.</u>, 431 B.R. at 57.