249 A.2d 414.
HOWARD E. BAILEY *vs.* RICHARD E. WEST.

JANUARY 22, 1969.

PRESENT: Roberts, C. J., Paolino, Powers, Joslin and Kelleher, JJ.

PAOLINO, J. This is a civil action wherein the plaintiff alleges that the defendant is indebted to him for the reasonable value of his services rendered in connection with the feeding, care and maintenance of a certain race horse named "Bascom's Folly" from May 3, 1962 through July 3, 1966. The case was tried before a justice of the superior court sitting without a jury, and resulted in a decision for the plaintiff for his cost of boarding the horse for the five months immediately subsequent to May 3, 1962, and for certain expenses incurred by him in trimming its hoofs. The cause is now before us on the plaintiff's appeal and defendant's cross appeal from the judgment entered pursuant to such decision.

The facts material to a resolution of the precise issues raised herein are as follows. In late April 1962, defendant, accompanied by his horse trainer, went to Belmont Park in New York to buy race horses. On April 27, 1962, defendant purchased "Bascom's Folly" from a Dr. Strauss and arranged to have the horse shipped to Suffolk Downs in East Boston, Massachusetts. Upon its arrival defendant's trainer discovered that the horse was lame, and so notified defendant, who ordered him to reship the horse by van to the seller at Belmont Park. The seller refused to accept delivery at Belmont on May 3, 1962, and thereupon, the van driver, one Kelly, called defendant's trainer and asked for further instructions. Although the trial testimony is in conflict as to what the trainer told him, it is not disputed that on the same day Kelly brought "Bascom's Folly" to plaintiff's farm where the horse remained until July 3, 1966, when it was sold by plaintiff to a third party.

While "Bascom's Folly" was residing at his horse farm, plaintiff sent bills for its feed and board to defendant at regular intervals. According to testimony elicited from defendant at the trial, the first such bill was received by him some two or three months after "Bascom's Folly" was placed on plaintiff's farm. He also stated that he imme- diately returned the bill to plaintiff with the notation that he was not the owner of the horse nor was it sent to plain- tiff's farm at his request. The plaintiff testified that he sent bills monthly to defendant and that the first notice he received from him disclaiming ownership was "* * * maybe after a month or two or so" subsequent to the time when the horse was left in plaintiff's care.

In his decision the trial judge found that defendant's trainer had informed Kelly during their telephone conver- sation of May 3, 1962, that "* * * he would have to do whatever he wanted to do with the horse, that he wouldn't be on any farm at the defendant's expense * * *." He also found, however, that when "Bascom's Folly" was brought to his farm, plaintiff was not aware of the telephone con- versation between Kelly and defendant's trainer, and hence, even though he knew there was a controversy surrounding the ownership of the horse, he was entitled to assume that "* * * there is an implication here that, 'I am to take care of this horse.'" Continuing his decision, the trial justice stated that in view of the result reached by this court in a recent opinion[1] wherein we held that the instant defendant was liable to the original seller, Dr. Strauss, for the pur- chase price of this horse, there was a contract "implied in fact" between the plaintiff and defendant to board "Bas- com's Folly" and that this contract continued until plain- tiff received notification from defendant that he would not be responsible for the horse's board. The trial justice fur- ther stated that "* * * I think there was notice given at

---

[1]See *Strauss* v. *West,* 100 R. I. 388, 216 A.2d 366.

least at the end of the four months, and I think we must add another month on there for a reasonable disposition of his property."

In view of the conclusion we reach with respect to defendant's first two contentions, we shall confine ourselves solely to a discussion and resolution of the issues necessarily implicit therein, and shall not examine other subsidiary arguments advanced by plaintiff and defendant.

*I*

The defendant alleges in his brief and oral argument that the trial judge erred in finding a contract "implied in fact" between the parties. We agree.

The following quotation from 17 C.J.S. *Contracts* §4 at pp. 557-560, illustrates the elements necessary to the establishment of a contract "implied in fact":

" * * * A 'contract implied in fact,' * * * or an implied contract in the proper sense, arises where the intention of the parties is not expressed, but an agreement in fact, creating an obligation, is implied or presumed from their acts, or, as it has been otherwise stated, where there are circumstances which, according to the ordinary course of dealing and the common understanding of men, show a mutual intent to contract.

"It has been said that a contract implied in fact must contain all the elements of an express contract. So, such a contract is dependent on mutual agreement or consent, and on the intention of the parties; and a meeting of the minds is required. A contract implied in fact is to every intent and purpose an agreement between the parties, and it cannot be found to exist unless a contract status is shown. Such a contract does not arise out of an implied legal duty or obligation, but out of facts from which consent may be inferred; there must be a manifestation of assent arising wholly or in part from acts other than words, and a contract cannot be implied in fact where the facts are inconsistent with its existence."

Therefore, essential elements of contracts "implied in fact" are mutual agreement, and intent to promise, but the

agreement and the promise have not been made in words and are implied from the facts. *Power-Matics, Inc.* v. *Ligotti,* 79 N. J. Super. 294, 191 A.2d 483 (1963); *St. Paul Fire & M. Ins. Co.* v. *Indemnity Ins. Co. of No. America,* 32 N. J. 17, 158 A.2d 825 (1960); *St. John's First Lutheran Church* v. *Storsteen,* 77 S. D. 33, 84 N.W.2d 725 (1957).[2]

In the instant case, plaintiff sued on the theory of a contract "implied in law." There was no evidence introduced by him to support the establishment of a contract "implied in fact," and he cannot now argue solely on the basis of the trial justice's decision for such a result.

The source of the obligation in a contract "implied in fact," as in express contracts, is in the intention of the parties. We hold that there was no mutual agreement and "intent to promise" between the plaintiff and defendant so as to establish a contract "implied in fact" for defendant to pay plaintiff for the maintenance of this horse. From the time Kelly delivered the horse to him plaintiff knew there was a dispute as to its ownership, and his subsequent actions indicated he did not know with whom, if anyone, he had a contract. After he had accepted the horse, he made inquiries as to its ownership and, initially, and for some time thereafter, sent his bills to both defendant and Dr. Strauss, the original seller.

There is also uncontroverted testimony in the record that prior to the assertion of the claim which is the subject of this suit neither defendant nor his trainer had ever had any business transactions with plaintiff, and had never used his farm to board horses. Additionally, there is uncontradicted evidence that this horse, when found to be lame, was shipped by defendant's trainer not to plaintiff's farm, but back to the seller at Belmont Park. What is most important, the trial justice expressly stated that he

---

[2]Compare *Arden Engineering Co.* v. *E. Turgeon Constr. Co.,* 97 R. I. 342, 347, 197 A.2d 743, 746, and *George Spalt & Sons, Inc.* v. *Maiello,* 48 R. I. 223, 226, 136 A. 882, 883.

believed the testimony of defendant's trainer that he had instructed Kelly that defendant would not be responsible for boarding the horse on any farm.

From our examination of the record we are constrained to conclude that the trial justice overlooked and misconceived material evidence which establishes beyond question that there never existed between the parties an element essential to the formulation of any true contract, namely, an "intent to contract." Compare *Morrissey* v. *Piette*, 103 R. I. 751, 753, 241 A.2d 302, 303.

## II

The defendant's second contention is that, even assuming the trial justice was in essence predicating defendant's liability upon a quasi-contractual theory, his decision is still unsupported by competent evidence and is clearly erroneous.

The following discussion of quasi-contracts appears in 12 Am. Jur., *Contracts,* §6 (1938) at pp. 503 to 504:

> "* * * A quasi contract has no reference to the intentions or expressions of the parties. The obligation is imposed despite, and frequently in frustration of, their intention. For a quasi contract neither promise nor privity, real or imagined, is necessary. In quasi contracts the obligation arises, not from consent of the parties, as in the case of contracts, express or implied in fact, but from the law of natural immutable justice and equity. The act, or acts, from which the law implies the contract must, however, be voluntary. Where a case shows that it is the duty of the defendant to pay, the law imputes to him a promise to fulfil that obligation. The duty, which thus forms the foundation of a quasi-contractual obligation, is frequently based on the doctrine of unjust enrichment. * * *
>
> "* * * The law will not imply a promise against the express declaration of the party to be charged, made at the time of the supposed undertaking, unless such party is under legal obligation paramount to his will to perform some duty, and he is not under such legal

obligation unless there is a demand in equity and good conscience that he should perform the duty."

Therefore, the essential elements of a quasi-contract are a benefit conferred upon defendant by plaintiff, appreciation by defendant of such benefit, and acceptance and retention by defendant of such benefit under such circumstances that it would be inequitable to retain the benefit without payment of the value thereof. *Home Savings Bank* v. *General Finance Corp.*, 10 Wis.2d 417, 103 N.W.2d 117.

The key question raised by this appeal with respect to the establishment of a quasi-contract is whether or not plaintiff was acting as a "volunteer" at the time he accepted the horse for boarding at his farm. There is a long line of authority which has clearly enunciated the general rule that "* * * if a performance is rendered by one person without any request by another, it is very unlikely that this person will be under a legal duty to pay compensation." 1 A. Corbin, *Contracts* §234.

The *Restatement of Restitution*, §2 (1937) provides: "A person who officiously confers a benefit upon another is not entitled to restitution therefor." Comment *a* in the above-mentioned section states in part as follows:

"* * * Policy ordinarily requires that a person who has conferred a benefit * * * by way of giving another services * * * should not be permitted to require the other to pay therefor, unless the one conferring the benefit had a valid reason for so doing. A person is not required to deal with another unless he so desires and, ordinarily, a person should not be required to become an obligor unless he so desires."

Applying those principles to the facts in the case at bar it is clear that plaintiff cannot recover. The plaintiff's testimony on cross-examination is the only evidence in the record relating to what transpired between Kelly and him at the time the horse was accepted for boarding. The defendant's attorney asked plaintiff if he had any conversation with Kelly at that time, and plaintiff answered in

substance that he had noticed that the horse was very lame and that Kelly had told him: "That's why they wouldn't accept him at Belmont Track." The plaintiff also testified that he had inquired of Kelly as to the ownership of "Bascom's Folly," and had been told that "Dr. Strauss made a deal and that's all I know." It further appears from the record that plaintiff acknowledged receipt of the horse by signing a uniform livestock bill of lading, which clearly indicated on its face that the horse in question had been consigned by defendant's trainer not to plaintiff, but to Dr. Strauss's trainer at Belmont Park. Knowing at the time he accepted the horse for boarding that a controversy surrounded its ownership, plaintiff could not reasonably expect remuneration from defendant, nor can it be said that defendant acquiesced in the conferment of a benefit upon him. The undisputed testimony was that defendant, upon receipt of plaintiff's first bill, immediately notified him that he was not the owner of "Bascom's Folly" and would not be responsible for its keep.

It is our judgment that the plaintiff was a mere volunteer who boarded and maintained "Bascom's Folly" at his own risk and with full knowledge that he might not be reimbursed for expenses he incurred incident thereto.

The plaintiff's appeal is denied and dismissed, the defendant's cross appeal is sustained, and the cause is remanded to the superior court for entry of judgment for the defendant.

*Ralph Rotondo,* for plaintiff.

*Bernard F. McSally,* for defendant.