**In re IDC CLAMBAKES, INC., Debtor.**

**No. 05–12267–MSH.**

United States Bankruptcy Court,
D. Rhode Island.

Signed May 16, 2014.

Matthew J. McGowan, Esq., Salter McGowan Sylvia & Leonard, William Devereaux, Esq., William E. O'Gara, Esq., Pannone Lopes Devereaux & West, LLC, Providence, RI, Kevin Venditouli, Esq., Law Offices of Kevin Venditouli, Newport, RI, for the debtor, IDC Clambakes, Inc.

William R. Grimm, Esq., Hinckley, Allen & Snyder, LLP, Charles D. Blackman, Esq., Law Offices of Charles D. Blackman, Providence, RI, for the Associations.

## MEMORANDUM OF DECISION AFTER REMAND ON DEBTOR'S OBJECTIONS TO CLAIM

MELVIN S. HOFFMAN, Bankruptcy Judge.

Before me are the objections of IDC Clambakes, Inc. ("Clambakes"), the debtor in this long-running chapter 11 case, to four identical proofs of claim filed in this case by Goat Island South Condominium Association, Inc., Capella South Condominium Association, Inc., America Condominium Association, Inc. and Harbor Houses Condominium Association, Inc. (collectively the "Associations"), docketed, respectively, as claims 16, 17, 18, and 19 in the claims register maintained by this court. The dispute giving rise to Clambakes' claim objections is nearly two decades old and involves a pair of trips to the Supreme Court of Rhode Island. The claims are for damages arising out of Clambakes' alleged seven-year trespass on a parcel of land known as the "Reserved Area" located on Goat Island, a small island in Narragansett Bay that is part of the city of Newport. The Associations act on behalf of their constituent island condominium owners. The claim objections have been the subject of nearly eight years of litigation, five decisions by three courts, and two remands. In the most recent appeal, the United States Court of Appeals for the First Circuit affirmed the district court on the issue of implied consent to the use and occupancy of the Reserved Area but remanded the case back to the bankruptcy court with instructions to determine "whether the implied consent in this circumstance gives rise to an obligation to pay the fair value for such use and occupancy and, if so, in what amount." *Goat Island S. Condo. Ass'n, Inc. v. IDC Clambakes, Inc. (In re IDC Clambakes Inc.)*, 727 F.3d 58, 72 (1st Cir.2013). For the reasons that follow, I find that Clambakes is under no obligation

to compensate the Associations for its use and occupancy of the Reserved Area.

## I. The Facts

It should come as no surprise that for a dispute of this vintage and provenance, the First Circuit would describe the record in this case as "problematic." *Goat Island S. Condo. Ass'n, Inc.*, 727 F.3d at 61. Nevertheless, the underlying facts, which have been examined and expounded upon at length by a number of other courts, are fairly well established. *See, e.g., Am. Condo. Ass'n, Inc. v. IDC, Inc.*, 844 A.2d 117, 119–26 (R.I.2004); *In re IDC Clambakes, Inc.*, 431 B.R. 51, 54–57 (Bankr.D.R.I. 2010); *Goat Island S. Condo. Ass'n, Inc.*, 727 F.3d at 61–63. An unabridged retelling of the decades-long history of this dispute is not necessary to the resolution of the narrow issue before me, however, and so I will focus only on salient facts.

On January 13, 1988, Globe Manufacturing Co. recorded in the Land Evidence Records of the City of Newport a declaration of condominium with respect to land on Goat Island. On March 3, 1988, Globe and the Goat Island South Condominium Association amended and restated the declaration. The declaration, among other things, reserved to Globe the right to exercise certain development rights with respect to an undeveloped parcel of land that has come to be known throughout this dispute as the Reserved Area. According to the declaration, as amended, if not exercised by December 31, 1994, these development rights would expire. Through a series of sales and assignments, the development rights were transferred from Globe to IDC, Inc. and finally to IDC Properties, Inc. ("Properties"), both affiliates of Clambakes. At all relevant times, Thomas Roos was the president and sole shareholder of IDC, Inc., Properties and Clambakes.

Between April and December 1994, through a number of amendments to the condominium declaration, IDC, Inc. and Properties attempted to extend the deadline and to exercise the development rights. Properties' or IDC, Inc.'s rights to develop the Reserved Area hinged on the validity of these declaration amendments. In the years following the adoption of the amendments, the Associations raised concerns regarding their validity. *See, e.g.,* Trans. Aug. 5, 2008 at 11–12, 16; Trans. Aug. 14, 2008 at 82–85; Debtor's Ex. 59. Discussions and negotiations over the declaration amendments dragged on for years and included execution of a series of statute of limitations tolling agreements, the last expiring on May 31, 1999.

In late 1997 and early 1998, Properties constructed a high-end banquet facility, the Newport Regatta Club, in the Reserved Area. Properties bore virtually the entire cost of construction, some $3 million. Trans. Aug. 14, 2008 at 37–39; Debtor's Ex. 55. Properties built the Regatta Club during the period its development rights were in dispute and at a time when Mr. Roos understood that the Associations were "trying to say that Properties had no right to construct the Regatta Club." *Goat Island S. Condo. Ass'n, Inc.*, 727 F.3d at 62. Despite their ongoing dispute, there is no evidence in the record of this matter to suggest that the Associations attempted to halt construction of the Regatta Club. In an oft-cited letter during this conflict, a representative of the America Condominium Association wrote to the Newport building inspector on February 9, 1998: "It's our understanding that a permit application has been filed with your Office for the purpose of constructing [the Regatta Club] . . . *While we don't have a particular objection as to the land use with respect to the building itself,* we do have a substantial problem with the parking requirements for that [building] . . . " Debtor's Ex. 63 (emphasis added).

Clambakes, the debtor here, came into existence on April 18, 1996. The parties agree that Clambakes is a corporate entity separate and distinct from the other entities owned by Mr. Roos. On March 1, 1998, Clambakes leased the Regatta Club from Properties under a twenty-year lease calling for annual rent equal to the higher of $180,000.00 or six percent of annual gross revenues. Creditors' Ex. P at 1. Under the terms of the lease, Clambakes was permitted to use the Regatta Club and surrounding land making up the Reserved Area to provide event hosting and catering services. *Id.* at 2. Clambakes began operating the Regatta Club in late 1998. Clambakes paid rent to Properties of $180,000.00 per year starting in 1999. *See* Creditors' Ex. U; SOFA Question 3(b); Debtor's Second Am. Discl. Stmt. at 25. As of June 16, 2005, the date Clambakes commenced this bankruptcy case, it owed Properties $48,500.00 for unpaid rent. Debtor's Second Am. Discl. Stmt. at 25. Clambakes' pre-petition financial records indicate that it ran a profitable business during the approximately seven years it operated the Regatta Club. Creditors' Ex. U; Joint Pretrial Compliance at ¶ 28.

On May 29, 1999, prior to the expiration of the parties' last tolling agreement, the Associations filed a seven-count complaint against Mr. Roos, IDC, Inc., and Properties in the Newport County Superior Court. In substance the complaint alleged: (1) that Properties failed to exercise its development rights with respect to the Reserved Area prior to the December 31, 1994 expiration date; (2) that the 1994 condominium declaration amendments were invalid to extend the expiration date; and (3) that as a result, fee simple title to the Reserved Area had vested in the condominium unit owners on whose behalf the Associations acted. Nearly five years of

litigation and appeals later, the Supreme Court of Rhode Island, in *Am. Condo. Ass'n, Inc. v. IDC, Inc.,* 844 A.2d 117, 131–33 (R.I.2004) (*"America I"*), determined that Properties had failed to timely exercise its development rights with respect to the Reserved Area and "[t]hereafter ... the [Reserved Area] vested in fee simple in the unit owners as tenants in common in proportion to their respective undivided interests." With respect to the Regatta Club building, the *America I* court held that the defendants were not entitled to any equitable relief on the basis that Properties had made a considerable investment to construct it. *Id.* at 134–35 ("Considering that they developed the Reserved Area at a time when they were on notice that their right to do so was in dispute, we conclude that they constructed the parcel at their peril and cannot now contend that equity should prevent plaintiffs from prevailing because of their expenditures.")

Approximately one year later on reargument, the Supreme Court of Rhode Island reaffirmed its *America I* holding in its entirety but clarified that the Reserved Area "always [was a] common element[ ], subject to the exercise of said development rights, and title vested with the unit owners in common ownership from the creation of the condominium." *Am. Condo. Ass'n, Inc. v. IDC, Inc.,* 870 A.2d 434, 443 (R.I.2005) (*"America II"*). Thus, as of April 8, 2005, the date of the *America II* decision, it was finally determined that, the development rights having expired without being properly exercised, the unit owners owned the Reserved Area and by implication any improvements thereon, including the Regatta Club.

Clambakes was not a party to the state court litigation[1] and in any event the state court action "did not involve any claims of

---

**1.** On this point the First Circuit noted "because the lease between IDC Properties and

IDC Clambakes was never recorded and Clambakes did business under the name

trespass, or appear to involve any issues related to trespass or damages flowing therefrom." *Goat Island S. Condo. Ass'n, Inc.*, 727 F.3d at 62. There is no evidence in the record that the Associations ever demanded or received rent from Clambakes or attempted to enjoin Clambakes' operation of the Regatta Club prior to the date of the *America II* decision. *See* Joint Pretrial Compliance at ¶ 29 (stipulating that Clambakes never paid the Associations anything for the use and occupancy of the Reserved Area during the claim period from March 1, 1998, the commencement date of the Clambakes–Properties lease, to April 8, 2005, the date of the *America II* decision). In fact, during this time Harbor Houses Condominium Association and several condominium unit owners contracted with Clambakes to host private events at the Regatta Club. "[I]t is clear that the Associations and the Roos entities have fought over and litigated every conceivable issue *except* Clambakes' occupancy and operation of the Regatta Club . . ." for the period in question. *Goat Island S. Condo. Ass'n, Inc.*, 727 F.3d at 67 (citing *IDC Clambakes, Inc.*, 431 B.R. at 60–61) (emphasis in original).

In the wake of the *America II* decision, the Associations asked the state court to issue writs of execution for possession and ejectment with respect to the Reserved Area. To stave off being ejected, on June 16, 2005, Clambakes filed its voluntary petition for relief under chapter 11 of the Bankruptcy Code (11 U.S.C. § 101 *et seq.*) commencing this case. On August 25,

2005, Judge Arthur N. Votolato entered a consent order permitting Clambakes to continue to operate the Regatta Club until November 5, 2005, and instructing the chapter 11 trustee, whom he had earlier ordered appointed, to pay the Associations $450,000.00 for Clambakes' use and occupancy of the Reserved Area from April 8, 2005 (the date of the *America II* decision) through November 5, 2005. Clambakes hosted its final event at the Regatta Club on November 5, 2005, and at midnight turned out the lights, locked the door and left.

A plan of reorganization[2] for Clambakes was confirmed by order dated March 15, 2006. Under the terms of the confirmed plan, all creditors other than Mr. Roos and entities owned by him would be paid in full. Debtor's Second Am. Plan at 8–12. As their claims were in dispute, funds to pay the Associations' claims in full were escrowed pending a final determination of Clambakes' claim objections. The funds remain in escrow to this day.

The Associations' proofs of claim are identical. Each asserts an unsecured claim against Clambakes in the amount of $3,507,290.00. Although each Association filed a separate proof of claim, the exhibit attached to each and the Associations' briefs filed on remand make it clear that the Associations are collectively asserting a single $3,507,290.00 claim in this case. The basis for the Associations' claim was "trespass" and the time period covered was "1998—April 7, 2005."[3] On March 15,

---

'Newport Regatta Club,' the record remains vague regarding the extent to which the Associations understood or were aware of the precise role Clambakes had in the development and operation of the Regatta Club." *Goat Island S. Condo. Ass'n, Inc.*, 727 F.3d at 62. At any rate, Bankruptcy Judge Votolato of this court later determined that the Associations' claims against Clambakes were not precluded by the *America I* or *America II* decisions. *IDC Clambakes, Inc.*, 431 B.R. at 61–62.

**2.** While called a plan of reorganization, it is perhaps more accurate to describe the plan as a liquidating plan since Clambakes ceased operating on November 5, 2005.

**3.** $7,290.00 of each Association's claim was characterized as "restitution" for expenses incurred related to sewer repairs. Judge Votolato allowed this portion of the claim in his decision of June 9, 2010. *IDC Clambakes,*

2006, Clambakes filed its objections[4] to the Associations' proofs of claim. On January 24, 2007, Judge Votolato granted summary judgment in favor of Clambakes disallowing the Associations' claims in their entirety. The Associations appealed.[5] On February 8, 2008, the United States District Court for the District of Rhode Island vacated Judge Votolato's ruling and remanded with instructions to: (1) "ensure that any disposition of the issue of whether Clambakes trespassed on Association property comport with due process requirements"; (2) "carefully adhere to the elements of trespass under Rhode Island law"; and (3) if a trespass was found "reconsider whether the Association's [sic] claim for trespass damages is precluded by either [America I] or [America II]." *Goat Island S. Condo. Ass'n, Inc. v. IDC Clambakes, Inc.*, 382 B.R. 178, 179 (D.R.I.2008).

After a nine-day bench trial, Judge Votolato once again disallowed the Associations' claims, ruling that the Associations had impliedly consented to Clambakes' use and occupancy of the Reserved Area for the claim period and, thus, Clambakes was not a trespasser. *IDC Clambakes, Inc.*, 431 B.R. at 61. The Associations again appealed to the district court, which affirmed the bankruptcy court's ruling. *In re IDC Clambakes, Inc.*, 484 B.R. 540, 548–49 (D.R.I.2012).[6] The Associations then appealed to the First Circuit which affirmed the district court's finding of no trespass due to implied consent but remanded to the bankruptcy court for further proceedings "regarding the issue whether the implied consent in this circumstance gives rise to an obligation to pay the fair value for such use and occupancy and, if so, in what amount." *Goat*

*Island S. Condo. Ass'n, Inc.*, 727 F.3d at 72.

## II. The Dispute

The Associations' argued in their post-trial brief to Judge Votolato that the "[f]air rental value [of the Reserved Area] is the same amount that a court would award if *either* the Associations by their conduct had impliedly consented to Clambakes' possession (*i.e.*, an implied-in-fact contract), *or* the law and equity compel a finding of implied consent (*i.e.*, an implied-in-law or a 'quasi-contract')." Pl.'s Post–Trial Mem. at ¶ 56 (emphasis in original). The Associations concluded that "[e]very theory of implied consent gives rise to a corresponding implied obligation to pay for the value of what was received." *Id.* In support of their position the Associations rely on three cases: *Narragansett Elec. Co. v. Carbone*, 898 A.2d 87 (R.I.2006); *R & B Elec. Co. v. Amco Constr. Co.*, 471 A.2d 1351 (R.I.1984); and *Bailey v. West*, 105 R.I. 61, 249 A.2d 414 (1969). All three are implied contract cases.

Given the opportunity to further brief the issue on remand, the Associations appear to have refined their position. They argue that under Rhode Island law the use and occupancy of another's land, even with consent, gives rise to a presumed obligation to pay fair value for such use and occupancy absent a showing of contrary intent. Under this formulation, the Associations maintain that Clambakes had the burden to prove that the Associations had consented to its use of the Reserved Area *for free* and that Clambakes failed to carry its burden. Alternatively, the Associations assert that they are entitled to the fair

---

*Inc.*, 431 B.R. at 62–63. That determination was not appealed.

4. Clambakes objected to the Associations' proofs of claim in a single, consolidated pleading.

5. Clambakes cross-appealed for reasons not relevant here.

6. Again Clambakes cross-appealed for reasons not relevant here.

value of Clambakes' use and occupancy of the Reserved Area under quasi-contract principles. The Associations place the value of Clambakes' use and occupancy of the Reserved Area for the claim period in the range of $2.6 million to $3.2 million based on expert testimony introduced at trial.

Clambakes asserts first that any claim based on a theory of implied contract, whether implied in fact or law, is not properly before me since the Associations' claims prior to and during trial were limited to trespass. Based on the First Circuit's order of remand, Clambakes argues that "[t]he only issue before this Court is whether, under Rhode Island law, implied consent, *within the context of trespass,* necessarily carries with it an implied obligation to pay and whether the Associations' apparent consent in this matter gave rise to such an implied obligation." Debtor's Mem. of Law on Remand at 7 (emphasis in original). Clambakes contends that Rhode Island law does not support the proposition that implied consent necessarily gives rise to an obligation to pay fair value and so it is not Clambakes' burden to prove that the Associations consented to its use of the Reserved Area for free. Furthermore, Clambakes asserts that, even if the Associations' implied contract claims are properly before me, it was the Associations' burden, which they have not carried, to prove that an implied-in-fact contract or quasi-contract existed. Accordingly, Clambakes argues that the Associations' claims should be disallowed in full.

Prior to taking the matter under advisement, I afforded the parties the opportunity to present additional evidence. They declined, choosing instead to rest on the evidentiary record already created, especially the evidence submitted at the trial.

## III. The Law and its Application

### 1. *Defining the Question Presented and Burden of Proof*

The First Circuit affirmed Judge Votolato's finding of implied consent by the Associations to Clambakes' occupancy of the Reserved Area and remanded "for further proceedings ... regarding ... whether the implied consent in this circumstance gives rise to an obligation to pay the fair value for such use and occupancy and, if so, in what amount." *Goat Island S. Condo. Ass'n, Inc.*, 727 F.3d at 72. The parties differ as to the exact parameters of the First Circuit's remand. The Associations argue that since Rhode Island law presumes an obligation to pay for use and occupancy of the land of another absent evidence to the contrary I am to determine whether Clambakes has carried its burden to show that the Associations consented to use of the Reserved Area for free. Clambakes responds that the Associations' presumed-obligation-to-pay argument is not supported by Rhode Island law and so the inquiry is over. The parties address recovery under the law of implied contract only in the alternative.

The Associations have failed to cite any Rhode Island law which supports either the proposition that in the context of a trespass action implied consent includes a presumed obligation to pay fair value absent proof of contrary intent or that it is Clambakes' burden to prove that the Associations impliedly consented to its use of the Reserved Area for free. The Associations do cite a number of secondary sources which provide, for example, that:

> In the absence of a contrary agreement, the use of property belonging to another person with that person's consent, or the use of premises with the consent of the person entitled to assert a right to the possession of the premises, implies an agreement by the tenant to pay the fair

rental value of the premises. *Although mere occupancy does not create a lessor-lessee relationship, recovery for the possession of premises may be based on the doctrine of unjust enrichment, or on a quantum meruit basis,* provided that a fair rental value is alleged and proven. 49 AM.JUR.2D *Landlord and Tenant* § 548 (2006) (emphasis added). These sources stand for the proposition that, generally, the law imposes an obligation to pay fair value for the use and occupancy of the land of another but the right to recover must be based on some independent cause of action such as unjust enrichment, the elements of which the party seeking payment must prove. The Associations also cite a number of implied contract cases, none of which supports the proposition that implied consent *necessarily* gives rise to a presumptive obligation to pay fair value absent a showing of contrary intent. In each case, the party asserting the existence of an obligation to pay had the burden to prove the existence of an implied contract.

■ The Associations' argument that Clambakes must prove not only consent but consent *for free* in order to defeat its trespass claim is not supported by Rhode Island law. I assume the First Circuit did not tacitly intend to change the law on this point, especially since the wording of its remand is "... gives rise to an obligation ..." and not "... gives rise to a *presumed* obligation ..." Under Rhode Island law "[c]onsent, in any form, is fatal to a claim for trespass." *Goat Island S. Condo. Ass'n, Inc.,* 727 F.3d at 61, 65 ("Rhode Island law ... defines a trespasser as one who intentionally and without consent or privilege enters another's property."). Thus, when the First Circuit affirmed the lower court's finding of consent the trespass inquiry ended.

■ The Associations' argument, as first presented in their post-trial brief,

most closely resembles a request for relief under a theory of implied contract. Moreover, the First Circuit acknowledged that the Associations' argument was based on three Rhode Island implied contract cases. *Goat Island S. Condo. Ass'n, Inc.,* 727 F.3d at 71. I can only conclude that pursuant to the First Circuit's remand I am to examine the Associations' claims under the Rhode Island law of implied contract and under that law it is the Associations' burden, as the party alleging the existence of an implied contract, to prove the elements of either an implied-in-law contract or quasi-contract. *See Bailey,* 249 A.2d at 416; *Fondedile, S.A. v. C.E. Maguire, Inc.,* 610 A.2d 87, 97 (R.I.1992). Clambakes is under no obligation to prove that the Associations consented to its use of the Reserved Area for free.

The burden of proof in implied contract cases must be applied in a manner consistent with the allocation of the burden of proof in bankruptcy claim objection proceedings generally. A proof of claim filed pursuant to the Federal Rules of Bankruptcy Procedure represents *prima facie* evidence of the validity of the claim. FED. R. BANKR.P. 3001(f); *In re Durastone Co.,* 223 B.R. 396, 397 (Bankr.D.R.I.1998). In *In re Colonial Bakery, Inc.,* 108 B.R. 13, 15 (Bankr.D.R.I.1989) the bankruptcy court summarized the procedure regarding claim objections as follows:

> (1) pursuant to Bankruptcy Rule 3001(f), the claimant establishes a *prima facie* case against the debtor upon the filing of its proof of claim; (2) the objecting party is then required to produce evidence to rebut the claimant's *prima facie* case; (3) once the objecting party produces such rebuttal evidence, the burden shifts back to the claimant "to produce additional evidence to 'prove the validity of the claim by a preponderance of the evidence.' The ultimate burden

of proof always rests upon the claimant...."

*Id.*

The Associations' proofs of claim conform substantially to Official Form B10, include written statements detailing their claims in compliance with FED. R. BANKR.P. 3001(a) and thus constitute *prima facie* evidence of the validity and amount of their claims. FED. R. BANKR.P. 3001(f). For reasons explained below, however, Clambakes has presented sufficient evidence to rebut the *prima facie* validity of the Associations' claims. Accordingly, the burden shifts back to the Associations to prove the validity of their claims, *i.e.* their entitlement to payment under the law of implied contract, by a preponderance of the evidence. Thus the burdens of proof applicable in a state law implied contract action and in this claims objection matter are in harmony—they fall on the Associations.

### 2. *The Existence of an Implied–in–Fact Contract*

As a preliminary matter I address Clambakes' threshold argument that any claim based on implied contract (whether in law or in fact) is not properly before me. The First Circuit has already determined that the implied-obligation-to-pay argument, *i.e.* the implied contract claim, first raised by the Associations in their posttrial brief was properly raised and preserved. *See Goat Island S. Condo. Ass'n, Inc.*, 727 F.3d at 71–72 ("Although the bankruptcy court never addressed the issue, the Associations did raise the argument."). Being bound by that determination, I must reject Clambakes' argument and proceed to the merits of the Associations' claims.

An implied-in-fact contract "is a form of express contract wherein the elements of the contract are found in and determined from the relations of, and the communications between the parties, rather than from a single clearly expressed written document." *Marshall Contractors, Inc. v. Brown Univ.*, 692 A.2d 665, 669 (R.I.1997). "The difference between an express contract and an implied-in-fact contract is simply the manner by which the parties express their mutual assent." *Id.* The essential elements of an implied-in-fact contract are "mutual agreement, and intent to promise, but the agreement and the promise have not been made in words and are implied from the facts." *Bailey*, 249 A.2d at 416.

As to the burden of proof here, Clambakes must have presented sufficient evidence to rebut the *prima facie* validity of the Associations' proofs of claim. Evidence sufficient to rebut the *prima facie* validity of the Associations' proofs of claim "consists of evidentiary-quality material which, if accepted, would qualify or contradict the claimant's asserted rights." *In re Perron*, 474 B.R. 310, 313–14 (Bankr.D.Me. 2012). The record contains a copy of a lease for the Reserved Area between Clambakes and Properties under which the parties performed for nearly the entirety of the claim period. Further, it is a stipulated fact that Clambakes "did not pay anything to [the Associations] for use and occupancy of the Reserved Area and improvements during the claim period." Joint Pretrial Compliance at ¶ 29. This evidence, taken together, establishes there was no oral lease between the Associations and Clambakes and is sufficient to rebut the *prima facie* validity of the Associations' claims as to the existence of an implied-in-fact contract. Thus, the burden shifts to the Associations to prove their implied-in-fact contract claims by a preponderance of the evidence. *Colonial Bakery*, 108 B.R. at 15.

The Associations have failed to carry their burden to establish the elements

of an implied-in-fact contract. There is no evidence that the Associations ever requested a rent payment from Clambakes or that Clambakes ever made a rent payment to the Associations. There is no evidence of mutual agreement as to duration and scope of occupancy. In short, there are no facts in the record that would suggest the existence of mutual intent on the part of the Associations and Clambakes to enter into an agreement for the use and occupancy of the Reserved Area.

It is true that the First Circuit observed that "[t]he *America* litigation made abundantly clear that even if the Associations consented to the operation of the Regatta Club, they would pursue their rights to ownership of the land and their right to compensation for the land's use." *Goat Island S. Condo. Ass'n, Inc.*, 727 F.3d at 71. But the Supreme Court of Rhode Island's rulings in the *America* litigation certainly did not establish the existence of mutual assent between the Associations and the occupants of the Reserved Area. If anything, six years of pre-petition litigation highlights the fact that there was no agreement between the parties. The First Circuit's conclusion that Clambakes entered into a lease with Properties and thus "understood that it owed money to the property owner (which it mistakenly believed to be IDC Properties) for use of the land" weighs against finding an implied-in-fact contract as well. *Id.* Clambakes already had a lease with the entity it believed to be the owner of the Reserved Area, so there would be no reason to lease the property again from another entity. For these reasons I find that the Associations have failed to carry their burden of proof as to the existence of an implied-in-fact contract.

### 3. *The Existence of a Quasi–Contract*

Rhode Island courts apply essentially the same standards in cases brought on theories of quasi-contract, also referred to as implied-in-law contract, and unjust enrichment. *R & B Elec. Co.*, 471 A.2d at 1355. "Recovery in quasi-contract requires a plaintiff to prove that '(1) the plaintiff conferred a benefit on the defendant, (2) the defendant appreciated the benefit, and (3) under the circumstances it would be inequitable for the defendant to retain such benefit without payment of the value thereof.'" *Fondedile, S.A.*, 610 A.2d at 97 (quoting *Hurdis Realty, Inc. v. Town of North Providence*, 121 R.I. 275, 397 A.2d 896, 897 (1979)). To succeed in a quasi-contract action, proof of "neither an actual promise nor privity is necessary." *R & B Elec. Co.*, 471 A.2d at 1355 (quoting *Bailey*, 249 A.2d at 417). "The obligation to pay in cases of quasi-contract 'arises, not from consent of the parties, as in the case of contracts, express or implied in fact, but from the law of natural immutable justice and equity.'" *Fondedile, S.A.*, 610 A.2d at 97 (quoting *Hurdis*, 397 A.2d at 897). Further, an "obligation is imposed despite, and frequently in frustration of," the parties' intentions. *Bailey*, 249 A.2d at 417.

"The concept of quasi-contractual liability rests upon the equitable principle that one shall not be permitted to enrich himself unjustly at the expense of another or to receive property or benefits without making compensation therefor." *R & B Elec. Co.*, 471 A.2d at 1355. For this reason, "[t]he most significant requirement for a recovery on quasi-contract is that the enrichment to the defendant be unjust." *Id.* at 1356. Simply conferring a benefit upon another party is not enough to establish a claim for unjust enrichment, "the court must look at the equities of each case and decide whether it would be unjust for a party to retain the benefit conferred upon it without paying the value of such benefit." *Id.*

At the nine-day trial in the bankruptcy court, both sides presented expert testimony regarding an appropriate use and occupancy charge for the Reserved Area from March 1, 1998 (the commencement date of the Clambakes–Properties lease) through April 7, 2005 (the day prior to the date of the *America II* decision). The Associations also presented evidence at trial that they had leased the Regatta Club and Reserved Area to a new tenant after Clambakes vacated the premises on November 5, 2005. Trans. Aug 5, 2008 at 32–34; Creditors' Ex. L. Under the terms of the new lease the tenant, Longwood Events, Inc., agreed to pay the Associations annual rent equal to the greater of $450,000.00 or eleven percent of annual gross revenues. Creditors' Ex. L at 1–6. The lease was dated November 18, 2005, and had an initial five-year term, commencing on March 31, 2006, with two five-year renewal options. *Id.*[7] The lease further provided that Longwood would reimburse the Associations for up to $500,000.00 of "litigation costs" related to the Reserved Area. *Id.* at 8. The Associations considered a number of proposals before entering into the lease with Long-

wood. *See* Trans. Aug. 5, 2008 at 32–34; Creditors' Ex. K. The Associations' expert, Steven R. Foster, concluded that the Longwood lease represented "an actual market transaction, negotiated between willing [parties] ... in the open market ... that shows what the value of the site was." Trans. Aug. 6, 2008 at 78; Creditors' Ex. Y at 20–21.

With regard to Clambakes' use and occupancy of the Reserved Area (including the Regatta Club), Mr. Foster ultimately concluded that the value of a use and occupancy claim was $2,600,000.00, based on a yearly rent of $400,000.00 for six and one-half years.[8] Creditors' Ex. Y at 38. Mr. Foster opined further that a fair estimate of rent attributable to the Regatta Club building only was $240,000.00 per year for the claim period and a fair estimate of rent attributable to the land comprising the Reserved Area, including the land under the Regatta Club, was in the range of $200,000.00 to $250,000.00 per year for the claim period based on its current usage. Trans. Aug. 6, 2008 at 97–102; Creditors' Ex. Y at 21–26.[9]

---

7. The lease provides for a third renewal term of five and one-half years, but the Associations retained the right to terminate the lease after the second renewal term if Longwood failed to make certain capital investments over the course of the prior terms. Creditors' Ex. L at 5–6.

8. Even though the period beginning with the commencement date of the Clambakes–Properties lease (March 1, 1998) through the date of the *America II* decision (April 8, 2005) is approximately seven years and one month, Mr. Foster included six and one-half years' worth of rent in his estimate of the value of the Associations' use and occupancy claim. Mr. Foster did not include the months of March through June 1998 to account for the time it took to construct the Regatta Club. Trans. Aug. 6, 2008 at 96–97. Nor did he include the months of January through April 2005 since Clambakes paid the Associations

$450,000.00 for the privilege of using and occupying the Regatta Club and Reserved Area for "most" of 2005 pursuant to Judge Votolato's August 25, 2005, consent order. Creditors' Ex. Y at 34

9. The method employed by Mr. Foster to calculate ground and building rent is not the method he employed to arrive at his ultimate conclusion regarding rent due for the claim period ($2.6 million). *See* Creditors' Ex. Y at 33–34. Mr. Foster described the method used to calculate ground and building rent as a "check" on the reasonableness of the $450,000.00 per year rent provided in the Longwood lease. Trans. Aug. 6, 2008 at 98. Nevertheless, Mr. Foster indicated that the figures included in his report were reasonable estimates of ground and building rent for the claim period. *See* Trans. Aug. 6, 2008 at 96–102; Creditors' Ex. Y 21–26.

Clambakes' expert, Peter M. Scotti, concluded that an appropriate use and occupancy charge for the land and building in the Reserved Area during the claim period was zero. Trans. Aug. 13, 2008 at 11–15; Debtor's Ex. 37 at 29–30. He reasoned that since the Associations had not paid anything for the construction of the Regatta Club, Clambakes' liability for use and occupancy should be limited to the land making up the Reserved Area, much like a ground lease. Trans. Aug. 13, 2008 at 8–10. Mr. Scotti determined that an appropriate use and occupancy charge for the land only was in the range of $136,500.00 to $199,100.00 per year or $819,000.00 to $1,194,600.00 total for the claim period, which Mr. Scotti rounded to an even $1,000,000.00. Debtor's Ex. 37 at 29. Mr. Scotti then concluded that the $1,000,000.00 use and occupancy charge should be offset by value "left . . . on the table" when Clambakes vacated the Reserved Area. Trans. Aug. 13, 2008 at 14. In Mr. Scotti's opinion the Associations were able to rent the Reserved Area to Longwood for $300,000.00 more per year than they otherwise could have because when Clambakes vacated the Reserved Area it left behind a function facility with a well-regarded reputation and established good will built at no cost to the Associations. *Id.* at 13–15. So, given the initial five-year term of the Longwood lease, Mr. Scotti determined that Clambakes "contributed" $1,500,000.00 in value to the Associations when it vacated the Reserved Area, more than offsetting the $1,000,000.00 use and occupancy amount for the claim period. Debtor's Ex. 37 at 30.

■ The fact that the Associations' own expert testified that the Associations are entitled to $2.6 million in use and occupancy charges, almost $1 million less than their $3.5 million claim amount, casts doubt on the validity of the Associations' proofs of claim. Further, Mr. Scotti,

Clambakes' expert, credibly testified that the Associations were owed nothing for the claim period due to the fact that they obtained the profitable Regatta Club business at no cost. Mr. Scotti's testimony is certainly enough to rebut the *prima facie* validity of the Associations' claims. *See Perron,* 474 B.R. at 313–14. Accordingly, the burden shifted to the Associations to prove by a preponderance of the evidence both the validity of their claims and the elements of a quasi-contract. *Colonial Bakery,* 108 B.R. at 15.

■ There is no doubt that the Associations have carried their burden of proof with respect to the first element required to establish entitlement to quasi-contractual relief. "A person confers a benefit upon another if he gives to the other possession of or some other interest in . . . land . . . or in any way adds to the other's security or advantage." Restatement (First) of Restitution § 1 cmt.b (1937). "The word 'benefit,' therefore, denotes any form of advantage." *Id.* Clambakes operated a profitable, high-end banquet facility in the Reserved Area under the terms of its lease with Properties for approximately seven years. This use of the Reserved Area sufficiently advantaged Clambakes to satisfy the first quasi-contract element.

Whether the Associations have met their burden of proof with respect to the second element, appreciation of the benefit, is less clear cut. This element is commonly defined as "knowledge by the defendant of the benefit." 26 Samuel Williston & Richard A. Lord, A Treatise on the Law of Contracts § 68:5 (4th ed. 1993). As stated above, the benefit conferred was use of the Reserved Area. Mr. Roos, Clambakes' sole shareholder and president, was familiar with the boundaries of the Reserved Area and made a conscious decision, through his wholly-owned entities (IDC, Inc., Properties, and Clambakes), to construct and operate the Regatta Club in the

Reserved Area. But Mr. Roos believed that Properties was the true owner of the Reserved Area and the Regatta Club. As far as Clambakes was concerned it was using the Reserved Area with permission of the owner and so it had no knowledge of any improper benefit. The Associations argue that Clambakes' intentional use of the Reserved Area alone is sufficient to satisfy this element. *See Narragansett Elec. Co.*, 898 A.2d at 100. Moreover, Properties constructed and leased the Regatta Club to Clambakes at a time when Mr. Roos was aware that the Associations were "trying to say that Properties had no right to construct the Regatta Club." *Goat Island S. Condo. Ass'n, Inc.*, 727 F.3d at 62. So there is a colorable argument to be made that Clambakes had reason to know of a benefit conferred by the Associations, at least potentially. Under the circumstances, I find that that the Associations have carried their burden with respect to the second quasi-contract element.

The third prong of the test for establishing entitlement to quasi-contractual relief is proof of the inequity that will result by permitting the recipient of the benefit to avoid paying for it. The Associations assert that the amount they are owed for Clambakes' use and occupancy of the Reserved Area for the claim period is in the range of $2.6 million to $3.2 million [10] based on expert testimony introduced by both sides at trial. This amount represents the value of the use and occupancy of the Reserved Area as improved. So a

portion of the rent the Associations claim they are due is attributable to the Regatta Club building. But the Regatta Club building was constructed at no cost to the Associations. The true benefit conferred by the Associations on Clambakes was allowing it to use and occupy the Reserved Area land, including land under the Regatta Club. The value of that benefit is what Clambakes would have paid during the claim period under a ground lease.[11]

Clambakes' expert, Mr. Scotti, estimated that a fair yearly rent for a ground lease of the Reserved Area would be in the range of $136,500.00 to $199,100.00, based on its use ancillary to a function facility. Mr. Scotti ultimately settled on $1,000,000.00 as the value of a ground lease for the entire claim period. The Associations' expert, Mr. Foster, placed the value in the range of $200,000.00 to $250,000.00 per year, for a total for the entire claim period of at most $1,625,000.00.[12]

A quasi-contract analysis hinges on the circumstances under which this benefit, valued at between $1,000,000.00 and $1,625,000.00, was conferred. There is no evidence that the Associations ever attempted to halt construction of the Regatta Club. Aside from the $3 million in construction costs paid by Properties, Clambakes spent more than $550,000.00 to outfit and maintain the Regatta Club, paid Properties approximately $1,125,000.00 in rent during the claim period, and presumably incurred other costs

---

**10.** The Associations attribute the $3.2 million figure to Clambakes' expert, Mr. Scotti. Although this figure was not included in his report, during cross-examination at trial Mr. Scotti testified that if one party owned both the Reserved Area and Regatta Club building, the "top of the range" for total rent for the claim period would be $3.2 million. Trans. Aug. 13, 2008 at 22–25.

**11.** Both sides' experts testified at trial that a ground lease is a common arrangement

whereby a landlord rents a plot of land to a tenant with the expectation that the tenant will construct any improvements thereon at his own expense. Trans. Aug. 6, 2008 at 96–102; Trans. Aug. 13, 2008 at 8–10. *See also* BLACK'S LAW DICTIONARY 971 (9th ed. 2009).

**12.** This calculation includes six and one-half years' worth of rent, consistent with Mr. Foster's report and testimony. *See supra*, note 8.

in establishing a profitable, will-regarded business. *See* Creditors' Ex. U; Debtor's Ex. 54; SOFA Question 3(b). Judge Votolato found and the First Circuit agreed that the Associations continuously and unequivocally consented to Clambakes' operation of the Regatta Club during the claim period. *IDC Clambakes, Inc.*, 431 B.R. at 60 ("This apparently consensual relationship between Clambakes and the Associations continued for more than seven years, with no written or verbal notice, signage, or any other type of claim made against Clambakes to quit the premises").

As a result of the *America* litigation, the unit owners represented by the Associations became the owners of the profitable Regatta Club business without spending a penny on construction, business development or maintenance. It appears from the record that the Associations were pursued aggressively by potential tenants for the Regatta Club and executed a lease with Longwood within two weeks of the date Clambakes vacated the premises. *See* Trans. Aug. 5, 2008 at 112–19; Creditors' Ex. K; Creditors' Ex. L. Under the terms of the lease, Longwood promised to pay the Associations $450,000.00 per year in minimum rent, with the potential for higher rent based on gross revenues, and up to $500,000.00 to compensate the Associations for litigation expenses over the course of the initial lease term. Creditors' Ex. L at 1, 5, 8; *See also* Debtor's Ex. 32 (letter from the Associations to unit owners: "sales are booming . . . [i]n 2008 we expect that the 11% will come into play for us for the first time."). In this light, the Associations could be viewed as the recipients of a windfall.

On the other hand, the Associations never asked Mr. Roos or any Roos-owned entity to construct the Regatta Club for them. Indeed, the Supreme Court of Rhode Island found that the defendants in the *America* litigation (which did not include Clambakes) were not entitled to equitable relief based on expenditures related to the construction of the Regatta Club. Further, the vast majority of Regatta Club construction costs were paid by Properties, not Clambakes, and the new tenant, Longwood, made a significant investment to renovate the Regatta Club after Clambakes vacated the premises. *See, e.g.,* Trans. Aug. 5, 2008 at 122–25; Debtor's Ex. 31 ("[m]illions of dollars are going into the property").

 Generally, "the owner of land is entitled to a mandatory injunction to require the removal of a structure that has been unlawfully placed upon his land." *Santilli v. Morelli*, 102 R.I. 333, 230 A.2d 860, 863 (1967).[13] Mr. Roos testified that he was willing to remove the Regatta Club building from the Reserved Area in the wake of the *America II* decision and even requested permission to do so. Trans. Aug. 15, 2008 at 85. The Associations denied him permission. *Id.* As opposed to seeking injunctive relief, "in the exercise of unquestionably astute business judgment" the Associations "wisely are putting their newly acquired property to its obvious highest and best use—as a cash cow with a virtually unlimited life expectancy." *IDC Clambakes, Inc.*, 431 B.R. at 62.[14] In oth-

---

**13.** The *Santilli* court goes on to state that:

> [T]he fact that such owner has suffered little or no damage because of the offending structure, or that it was erected in good faith, or that the cost of its removal would be greatly disproportionate to the benefit accruing to the plaintiff from its removal, is not a bar to the granting of coercive relief.

*Santilli*, 230 A.2d at 863.

**14.** In their May 29, 1999, state court complaint, the Associations, under a count entitled "Estoppel—Development Rights," do seek "a preliminary and permanent injunction . . . requiring restoration of the [Reserved Area] to [its] condition as of December 31, 1994 . . ." Creditors' Ex. D at 12–13. Evidently, the Associations abandoned this request.

er words, the Associations have made a conscious business decision to reap the benefits that flow from keeping the Regatta Club building in the Reserved Area.

Quasi-contract analysis focuses on events as they actually occurred, not on could-haves or should-haves. For example, in *R & B Electric, supra,* an electrical contractor was hired by a corporation, Amco, to perform work on a home owned by another corporation, Eagle Realty. *R & B Elec. Co.,* 471 A.2d at 1352–53. The same two individuals owned Amco and Eagle Realty as equal shareholders. *Id.* The contractor completed its work but was not paid in full. *Id.* By the time the contractor brought suit, Amco had dissolved and the home had been sold at a foreclosure sale. *Id.* The contractor had failed to perfect a mechanic's lien on the home prior to bringing suit. *Id.* The court denied the contractor's quasi-contract claim against Eagle Realty and its two principals because: (1) the contractor had an agreement with Amco, not the other parties; (2) any benefit conferred on Eagle Realty or its principals was fleeting because the foreclosure sale took place shortly after the work was completed; and (3) the contractor bore some responsibility for failure to perfect a mechanic's lien. *Id.* at 1356. The dissolution of Amco and the foreclosure sale of the home, while out of the contractor's control, were ultimately deciding factors, facts on the ground so to speak, in the denial of equitable relief on a theory of quasi-contract.

Here, since the Associations chose to retain and profit from the Regatta Club, the resulting benefit reaped by the Associations must factor into the quasi-contract analysis. As for the Supreme Court of Rhode Island's determination in *America I,* that the state court defendants (Mr. Roos, IDC, Inc., and Properties) were not entitled to equitable relief in light of the Regatta Club's construction costs, first,

Clambakes was not a party to that ruling, and second, even if that ruling is preclusive as to Clambakes, Mr. Roos, IDC, Inc., and Properties were the ones seeking equitable relief and thus bore the burden of proof to demonstrate their entitlement. Here, the Associations bear the burden of proof and must demonstrate by a preponderance of the evidence that they are entitled to equitable relief. Demonstrating that Clambakes could not carry a similar burden is beside the point.

The fact that Properties, and not Clambakes, incurred the majority of the Regatta Club's construction costs does not change the outcome. Besides, Clambakes paid Properties rent of approximately $1,125,000.00 over the course of the claim period, which could be viewed in whole or in part as shifting a substantial portion of Properties' construction costs to Clambakes. Furthermore, the *America* litigation and this matter arise out of the same facts and circumstances. The fact that the unit owners now own the Regatta Club building as a result of the *America* litigation must be taken into account when considering the balance of equities in determining whether Clambakes should be required to pay use and occupancy.

As for the fact that Longwood made a significant investment to renovate the Regatta Club building after Clambakes vacated the premises, the evidence does not establish that the pre-renovation state of the Regatta Club affected the amount of rent the Associations were ultimately able to charge or the speed with which a new lease could be executed. On the contrary, the Associations entertained a number of offers and had a new tenant in place within weeks of the date Clambakes vacated the premises. Accordingly, Longwood's post-lease investment does not affect this analysis.

Not every structure Properties could have built on the Reserved Area would have had value to the Associations. But Properties constructed an events center in which Clambakes created a profitable business over the course of seven years and then delivered to the Associations. The most logical way to quantify the value of the Regatta Club to the Associations is to consider the income it has generated and will continue to generate for the Associations from April 8, 2005 (the date of the *America II* decision) forward. In his report, Mr. Foster, the Associations' expert, stated that a fair estimate of the annual rent attributable to the Regatta Club building for the claim period would have been $240,000.00 per year. Creditors' Ex. Y at 26. Mr. Scotti, Clambakes' expert, estimated rent attributable to the Regatta Club building to be $300,000.00 per year. Debtor's Ex. 37 at 30. So taking the Associations' number, the benefit received by the Associations in the wake of the *America II* decision is at least $240,000.00 per year.[15]

The quasi-contract analysis boils down to weighing Clambakes' use of the Reserved Area land valued at $1,000,000.00 to $1,625,000.00 for the claim period against the stream of income to the Associations from the Regatta Club building, sluicing along at a rate of at least $240,000.00 per year. Certainly the amount of building rent which can equitably be attributed to Properties' and Clambakes' initial investment will dissipate over time, but not before the value to the Associations surpasses even the most generous estimate of the benefit conferred on Clambakes. The cost to construct the Regatta Club was approximately $3 million, which does not include the costs incurred over seven years to outfit, maintain and market it. Under a quasi-contract analysis, Clambakes is entitled to a "credit" for at least $1,625,000.00 of those costs, equal to the high end of the value of a ground lease by the Associations for the claim period.[16] In short, the Associations have not carried their burden of proving that they conferred a benefit on Clambakes under such circumstances that it would be unjust for Clambakes to retain the benefit without paying the fair value thereof. For this reason, I find that the Associations have failed to prove their entitlement to quasi-contractual relief.

## IV. The Result

For the reasons set forth above, I find that in the circumstances of this contested matter the Associations' implied consent to Clambakes' use and occupancy of the Reserved Area does not give rise to an obligation by Clambakes to pay for the use and occupancy thereof. Accordingly, Clambakes' objection to each of the Associations' claims will be sustained. Claims 16, 17, 18, and 19 are disallowed in their entirety. A separate order shall enter.

## ORDER

For the reasons set forth in the memorandum of decision issued today, IDC Clambakes, Inc.'s Objection to Claims of America Condominium Association, Inc.,

---

**15.** Longwood's base rent for the land and building of $450,000.00 supports this building-only rent figure. Mr. Foster testified that in addition to a building rent figure of $240,000.00 per year, the rent of a ground lease would have been $200,000.00 to $250,000.00 per year.

**16.** This is not to suggest that Clambakes is entitled to credit for more than $1,625,000.00. My ultimate finding that the Associations failed to prove their entitlement to quasi-contractual relief turns heavily on the fact that it is the Associations which bear the burden of proof. It is possible that the equities of this case are such that neither side would be able to prove its entitlement to relief under a theory of quasi-contract or unjust enrichment.

Capella South Condominium Association, Inc., Harbor Houses Condominium Association, Inc. and Goat Island South Condominium Association, Inc. [# 280] is SUSTAINED. Claims 16, 17, 18, and 19 are DISALLOWED in their entirety.